**B. V. BUREAU WIJSMULLER, Plaintiff,**

v.

**UNITED STATES of America as Owner of the Warship JULIUS A. FURER, Defendant.**

No. 76 Civ. 2494–CSH.

United States District Court, S. D. New York.

Sept. 20, 1979.

Healy & Baillie, New York City, for plaintiff; John P. McMahon, New York City, of counsel.

Robert B. Fiske, Jr., U. S. Atty., Gilbert S. Fleischer, Atty. in Charge, Admiralty & Shipping Section, Dept. of Justice, New York City, for United States; Philip A. Berns, Washington, D. C., of counsel.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

Plaintiff B. V. Bureau Wijsmuller ("Wijsmuller"), a Netherlands towing and salvage company, brings this suit in admiralty to recover an award for salvage services rendered to the USS JULIUS A. FURER ("FURER"), a warship owned by defendant United States of America, after the FURER grounded on June 30, 1974 on a sandbar off the Dutch coast. Jurisdiction is based upon the Public Vessels Act, 46 U.S.C. § 781 *et seq.*, the Government having conceded for the purposes of this action the requisite reciprocity, 46 U.S.C. § 785, and this Court having rejected plaintiff's prior effort to compel arbitration of its claim in London under the terms of a Lloyd's Open Form salvage agreement executed by the FURER's commanding officer.[1] Four tugs owned by Wijsmuller allegedly assisted the FURER off the strand. The Government concedes that Wijsmuller rendered salvage services to the FURER, and is consequently entitled under the general maritime law to a salvage award. The ultimate question for decision is the reasonable amount of that award. The parties assume their traditional postures. Wijsmuller, as salvor, contends that its highly skillful efforts preserved the FURER from a substantial risk of total loss. The Government, as owner of the salved property, contends that there was little risk to the FURER, and that the assisting tugs' efforts had little to do with her refloating. In addition to the questions which derive from that basic issue, common to most salvage cases, two additional questions arise: whether Wijsmuller should be regarded as a professional salvor, and thus entitled to the particular consideration which the law gives to such entities in making salvage awards; and whether the Court's award should include a factor reflecting the change in the rate of exchange between United States and Dutch currency which has taken place since the rendition of the salvage services, and the entry of judgment. The case having been tried to the Court without a jury, the Court now enters the following Findings of Fact, Discussion and Conclusions of Law.

### FINDINGS OF FACT

1. The FURER was a United States Navy guided missile armed, anti-submarine warfare escort ship. The FURER had a bulbous bow consisting of a sonar dome, which is ordinarily kept filled with 94 tons of water. The dome extended ten feet below the straight line keel. The propeller, at its deepest point, extended 7 feet 7¼ inches below the keel. At 1355 hours on June 29, 1974, the FURER sailed from the Dutch port of Den Helder, bound for Aalborg, Denmark. At about 2100 hours on June 29, the FURER's medical staff diagnosed a sick crewman's condition as appendicitis. The FURER reversed her course, and increased speed to 20 knots to rendezvous with a Dutch medical evacuation helicopter. The helicopter turned back because of alleged poor visibility, and the Dutch naval authorities instead sent a tug to meet the FURER and evacuate the crewman. The FURER changed course again to rendezvous with the tug. While proceeding at about 20 knots on a heading of 125° true, the FURER ran aground at about 0123 hours on June 30. The FURER grounded on the Haaksgrunden Bank sandbar, to the west of Den Helder, at a position later established by cross bearings to be 52° 57′ 42″ N and 4° 35′ 54″ E. At the time of the grounding, the sonar dome was filled with water.[2]

---

1. 1976 A.M.C. 2514 (not officially reported).

2. The parties entered into a Stipulation of Agreed Facts (hereinafter "S.F."), ¶¶ 6, 8, 9 and 10 of which form the basis for most of this

2. The FURER was launched in July 1966, and commissioned on November 11, 1967. Since the value of the salved property is an important element in determining the proper amount of a salvage award,[3] considerable evidence was offered on this point. The FURER was a specially designed and constructed vessel, having a value only for a special purpose, and thus no market value can be established. In these circumstances, the FURER's salved value is its replacement value, less depreciation.[4] At the time of rendition of the salvage services, the Navy was carrying the FURER at a depreciated book value of $20,000,000. This is based upon a reproduction cost in 1974 of $40,323,718, a figure testified to by a Government witness and accepted by the plaintiff;[5] and the application of a 16-year depreciation period which the Government derived from a statutory definition, 10 U.S.C. § 7295, of when a naval vessel is "underage."[6] The Government bases its calculation of a depreciated value for the FURER, in July of 1974, of $20,000,000 (in round numbers) upon the fact that of this statutory life of 16 years, 8 years had passed since the vessel's launching in July of 1966, an event also referred to as the "keel date." Wijsmuller argues for a higher salved value, on the theories that a meaningful period of depreciation cannot run until the vessel was commissioned and fully ready for service; and that the vessel's useful life might well exceed the 16 years specified by the statute. In that latter regard, evidence was adduced that some World War II destroyers were still in commission at the time of trial, some 30 years later. I do not regard the precise salved value of the FURER as of overwhelming importance, since by any yardstick it amounts to at least $20,000,000, far and away the highest salved value involved in any reported American salvage decision. To the extent that a precise finding is necessary, I find that the salved value of the FURER was $23,400,000, a figure which reflects the replacement cost of $40,000,000, and the fact that only 6.64 years had passed since the FURER was commissioned and her useful operational life began. Wijsmuller's evidence with respect to the longer lives of different kinds of vessels (which if adopted to the FURER would result in a longer period of depreciation and hence a higher salved value) does not support a finding with respect to a vessel of the FURER's particular characteristics. I therefore apply the 16-year statutory period of depreciation, but measure that period from the date of commission, not the keel date.

3. The Wijsmuller company was formed in 1911, and has been engaged in the business of oceangoing towage, salvage, and other marine activities since then. In June and July of 1974 the company owned or operated 15 tugs and one special salvage vessel, the KRAB, which was designed not for towing, but for pumping, under-water cutting and repair, and lifting. Seven of the 15 tugs were oceangoing; the others were smaller and generally confined their activities to harbors. In 1974 Wijsmuller maintained some of its oceangoing tugs on "salvage station" in various parts of the world. A vessel on salvage station accepts no other employment. She stays in one place, monitors all emergency radio frequencies, and responds to any requests for assistance within her geographical area. The salvage stations Wijsmuller tugs main-

---

paragraph. The FURER's grounded position is established by the deposition of her commanding officer, Cdr. Steven H. Edwards, DXA on the trial, at 12–13, the navigation chart, DXA11, and the deck log, DXA1.

3. *The Blackwall*, 77 U.S. (10 Wall.) 1, 19 L.Ed. 870 (1869); p. 170, *post*.

4. *Petition of United States*, 229 F.Supp. 241 (D.Ore.1963).

5. Fetchko, Tr. 452; and see Tr. 443.

6. The statute reads:

"Vessels of the following type are considered under-age for the period after completion indicated below:
(1) Battleships—26 years.
(2) Aircraft carriers—20 years.
(3) Cruisers—20 years.
(4) Submarines—13 years.
(5) Other combatant surface vessels—16 years."

The FURER falls within category (5).

tained included the Persian Gulf, the Caribbean, the Mediterranean, the North Atlantic, South African waters, the English Channel, and the North Sea. These several stations were not continuously maintained by Wijsmuller tugs. Seasonal conditions and the likelihood of casualties were considered. The company would on occasion remove a tug from a salvage station and use her to perform an oceangoing towage contract if the circumstances indicated this was the most profitable present use to make of the vessel. At the time the FURER stranded, Wijsmuller had the tug GRONINGEN on salvage station in the Persian Gulf; the FRIESLAND on station in Durban, South Africa; the GELDERLAND on "mobile salvage station" in the North Atlantic; and the UTRECHT, specially designed as a rescue tug, on salvage station in the southern part of the North Sea. Some days before the FURER grounded, the Wijsmuller tug WILLEM BARENDSZ had been on salvage station in the English Channel off Penzance, and the UTRECHT in the North Sea. When the FURER grounded, the BARENDSZ was in her home port of Ijmuiden for routine repairs, and the UTRECHT was shifted to a more southerly position. Captain Nan. G. Halfweeg, who in 1974 directed Wijsmuller's salvage department, estimated that in that year 50 percent of the company's operations related to salvage; in addition to salvage and towage, the company was involved in offshore installations, offshore maintenance, wreck removal, and diving services. The company's managing director, Dr. Johannes F. Wijsmuller (his degree is in law), gave evidence and introduced documents from which more precise calculations might arguably be made; but no further precision is necessary to arrive at the pertinent findings of fact, which are that at the time of Wijsmuller's rendition of the salvage services in suit, the company devoted a substantial portion of its efforts to salvage, and in furtherance of that activity maintained specially equipped tugs on salvage stations for significant periods of time, in areas where vessels, their cargoes, and the lives of those on board could foreseeably require assistance.[7]

4. Before the FURER was refloated in the early morning hours of July 1, a number of unsuccessful efforts were made. The details are for the most part undisputed, and set forth in the Statement of Agreed Facts. At 0131 on June 30 the FURER tried to back herself off, placing her engines back ⅓ at 0131 hours and back ⅔ at 0132. The FURER has a single propeller. After about three minutes the engines were stopped. Between 0140 and 0145 hours she tried again, with the engines at back ⅓ and then back ⅔. She did not come free. The FURER's captain requested assistance from Royal Dutch Navy authorities. At about 0254 hours the Dutch naval tug ordered to meet the FURER for the medical evacuation made up on the FURER's starboard side and tried to tow her off the strand. The tug was a small vessel of about 300 horsepower. The FURER assisted with her engines, which were placed on back ⅔ at 0301 hours; back full at 0305; back ⅔ at 0307; stop at 0322; back ⅔ at 0327; back full at 0338; and stop at 0345. The FURER remained aground. At about 0517 a second Dutch naval tug arrived. Both tugs tried to free the FURER, without success. The FURER's commanding officer, Cdr. Stephen Edwards, decided not to make further use of his vessel's engines, to avoid the possibility of damaging them. He also decided not to pump out the sonar dome. Prior to the arrival of the second naval tug, the naval officers and Den Helder port authorities had advised Cdr. Edwards that if he was not willing to use the FURER's engines, the available navy tugs lacked sufficient power to free the vessel. In the circumstances they recommended that Edwards engage civilian tugs, and recommended Wijsmuller which had tugs at the nearby port of Ijmuiden. Edwards agreed,

7. The findings in this paragraph are based upon S.F. ¶ 2; Wijsmuller, Tr. 32–37, 154–162; Half-weeg deposition, PX14, pp. 5–9, 28–32; Van Dien & Co. report, PX9.

and at his request the navy authorities contacted the Wijsmuller office.[8]

5. Wijsmuller maintains a radio room in its offices at Ijmuiden which continuously monitors all emergency and shipping frequencies. The radio officer on duty received the request to assist the FURER. Pursuant to standing orders, the radio officer directed two Wijsmuller tugs, the CYCLOOP and TITAN, stationed at the company's berth at Ijmuiden, to proceed to the FURER. The CYCLOOP sailed from Ijmuiden at 0400 hours and the TITAN at 0415. Both tugs arrived at the FURER at about 0700. The TITAN prepared its towing gear, made up to the FURER's stern at 0747, and dropped anchor waiting for the next high water. The CYCLOOP anchored nearby awaiting further orders. The radio officer, having dispatched CYCLOOP and TITAN to the scene, telephoned salvage superintendent Halfweeg at his home. Halfweeg then drove to the office, arriving about 45 minutes after he had been awakened from sleep, and telephoned the naval authorities at Den Helder, who described the FURER and the general situation. Halfweeg examined the weather forecasts, which indicated a depression developing in the North Atlantic. He telephoned the weather bureau and asked for a forecast for the area of the grounding. The bureau responded with a prediction that within about 24 hours, the weather, which was then favorable, would deteriorate with northwesterly winds of force 6 to 8 on the Beaufort scale.[9]

6. Captain Jozef Handgraaf, a Wijsmuller tug master, boarded the FURER as salvage coordinator. No salvage work was performed until Cdr. Edwards signed the Lloyd's Open Form of salvage agreement, which he did at about 1100 hours on June 30. The two Royal Dutch Navy tugs and a Navy diving boat, which had also been in attendance, cleared away. At about 1120 hours the CYCLOOP, having made up on

the FURER's port side forward of amidships "Chinese style," or bow to stern, began scouring sand, a process which involved washing sand away from the FURER's bottom with the tug's propeller wash and Kort water nozzles.[10]

7. Halfweeg, at the Wijsmuller offices at Ijmuiden, learned during the early morning of June 30 of the FURER's sonar dome. He concluded that the vessel was imprisoned by the dome having grounded in the sand. In view of the forecast of deteriorating weather, and the physical characteristics of the sand bank upon which the FURER had grounded (see ¶ 17, *post*), Halfweeg decided to send increased towing power to assist the warship. He ordered the WILLEM BARENDSZ to make ready for sea and sail from Ijmuiden, and ordered the UTRECHT to make for the scene from her North Sea salvage station. The BARENDSZ left Ijmuiden at 1310 hours on June 30, arrived at the FURER at about 1540, and made up aft. The UTRECHT received Halfweeg's radio orders at 0835, got underway at 0855, and arrived at the FURER at 1630 on June 30.[11]

8. There is a degree of dispute between the parties as to the value of the vessels employed by Wijsmuller in the salvage operation, that being one of the elements considered in fashioning a salvage award. The CYCLOOP was built in 1957. She was a seagoing, single screw diesel tug, specially designed for salvage work on the Dutch coast, although also able to perform long-distance towing. Her length overall was 103 feet 4 inches, her gross tonnage was 255, and her engines were capable of 2150 IHP (indicated horsepower). The TITAN, built in 1956, was of virtually identical characteristics. The WILLEM BARENDSZ was an oceangoing, single screw diesel tug, specially designed for ocean towage, rescue and salvage work. Her length overall was 172 feet 11 inches, her gross

8. S.F. ¶¶ 15, 17, 19, 20.

9. S.F. ¶¶ 21, 22, 25, 26; Halfweeg deposition, pp. 10–14.

10. S.F. ¶¶ 35–39.

11. S.F. ¶¶ 48, 49, 55; Halfweeg deposition, pp. 17–18; UTRECHT log, PX20.

tonnage was 658.53, and her power was 6350 IHP. The BARENDSZ was built in 1963. The UTRECHT, built in 1956, was an oceangoing, single screw diesel tug, also specially designed for ocean towage, rescue and salvage work. Her length was 173 feet 1 inch overall, her gross tonnage 638.20, and her power 4200 IHP. Plaintiff offered in evidence (PX4) a written statement of the four tugs' market value as of June, 1974, prepared by an experienced London ship broker. The valuations given were: CYCLOOP, £240,000; TITAN, £240,000; WILLEM BARENDSZ, £900,000; UTRECHT, £645,000. The value of the English pound on July 1, 1974 was $2.386. Accordingly these calculations of market value for the CYCLOOP, TITAN, BARENDSZ, and UTRECHT translate into dollar figures of $572,640, $572,640, $2,147,400, and $1,538,970, respectively, for a total of $4,831,650. The Government challenges these figures, as inflated and prepared with a view toward litigation. In that regard, the Government points to a special review of the assets of the company made by its auditors (PX9), which refers to a sale value of all seven tugs in the seagoing service in a total amount of 11,500,000 Dutch florins. This is referred to in the exhibit as a "rough" total, prepared by a Mr. Van Lambaart (a Wijsmuller employee) at the end of 1973, the total sale value having also been "reduced by a 20% safety margin." The parties stipulated that the average value of the florin (or guilder) in December of 1973 was 35.615 cents per guilder (Tr. 81). Thus the total sale value of the seven tugs, according to this document, and reduced by the "20% safety margin," was the equivalent of $4,095,725. Taking this figure as 80% of a more realistic sale value, a total value of $5,119,656 for the seven oceangoing tugs results. This would appear somewhat inconsistent with a claimed total value in excess of $4,800,000 for the four tugs which engaged in the salvage operation. Dr. Wijsmuller, in his testimony, suggested that the Van Lambaart figures were too low. The only evidence of actual sale in the record is that of the UTRECHT in January of 1977, Wijsmuller having sold the vessel

for 2,000,000 guilders. In December of 1974 the guilder was worth 39.331 cents (Tr. 81); thus, measured by that rate of exchange, the sale was the equivalent of $786,620, but the guilder had probably appreciated further in relation to the dollar as of January, 1977, although the record does not indicate the precise rate of exchange at that date. Furthermore, I accept Dr. Wijsmuller's testimony that owing to world shipping conditions, the market value of tugs had declined between 1974 and 1977. I am certainly not prepared to disregard entirely the evidence of expert ship brokers introduced by the plaintiff; to be sure, these estimates were prepared with a view toward litigation, but if the Government felt the estimates were completely out of line, it could have offered evidence from a ship broker of its own choosing. No precise valuation of the salvor's property is necessary, in the context of the case. The element is less significant in computing the amount of a salvage award. It is evident from the record that the four tugs employed in the salvage service had a total value, at the time of rendition of the services, of several million dollars, certainly not less than $3,000,000, and in greater likelihood about $4,000,000. That is a sufficient valuation for the purposes of decision.

9. As with the case of the initial efforts made by the Royal Dutch Navy tugs, the initial, unsuccessful efforts of Wijsmuller's tugs to refloat the FURER are for the most part covered by the Statement of Agreed Facts. After inspecting the FURER, Dutch Navy divers had reported that a sandbar extended from the sonar dome to the vessel's bridge. Soundings were taken by the FURER's crew, and at 0957 hours on June 30 the warship's status was recorded in her deck log as follows: "Sonar dome in sand, rest of ship sitting in sand. Damage being inspected now. Screw possibly in sand." At 1120 hours the CYCLOOP began scouring sand, in the manner described *ante*. At about 1200 the TITAN began towing and sheering. "Sheering" involves sudden acceleration of the tug with a slack towing

wire, so that a jerking or sudden pulling effect is accomplished. The CYCLOOP and TITAN combined in these efforts throughout the early afternoon of June 30. They could not free the FURER. Upon one occasion the CYCLOOP's pennant wire parted; upon another so did the pennant wire of the TITAN. The tugs reattached themselves to the FURER, and went on working. The next predicted high water was at 1620 hours, with a range of 6.0 feet. Captain Handgraaf, who had boarded the FURER from the CYCLOOP, hoped to free the FURER during that high tide. The WILLEM BARENDSZ, which had arrived in the vicinity of the FURER about 1540 hours and made up aft, began towing at about 1600 hours, thereafter increasing to full power. The CYCLOOP and TITAN were also towing in tandem. The FURER's deck log records that at 1612 hours the rudder seemed to be clear, and that at 1615 hours the vessel appeared to be moving, there was no apparent pressure on the rudder fantail, and the vessel appeared to be floating free. At 1642 hours, the FURER's engines were placed on ⅓ back for about 17 minutes. The UTRECHT arrived at 1630, but did not participate in the presently ongoing efforts. The CYCLOOP's pennant wire parted again, at about 1627 hours. At 1635 the bitt on the FURER to which the BARENDSZ's towing wire was connected began bending, and at 1713 the bitt began tearing out of the FURER's deck. The Government contends that this particular bitt should not have been used for towing purposes, and that Handgraaf made no inquiries as to which bitt should have been used. Plaintiff counters that if the bitt should not have been used, the FURER's personnel should have told Handgraaf so. I do not regard the issue as a significant one. It was at about this time, however, that Handgraaf and Cdr. Edwards decided to stop the attempt to free the FURER until shortly before the next high tide, which was predicted for 0456 hours on July 1.[12]

10. The next effort to free the FURER, in the early morning hours of July 1, was successful. The manner in which that happy result was achieved, and the relative values of the contributing forces, give rise to significant disputes between the parties. In formulating the findings of fact which address these questions, I must rely entirely upon depositions and documents in evidence. That is because none of the witnesses participating in the events appeared at the trial. All those concerned at the scene, Wijsmuller employees on the one hand and officers and crew of the FURER on the other, testified by deposition. This presents certain disadvantages for the trial judge. He cannot observe the demeanor of the witnesses as they testify, and has no opportunity to pose questions of his own which he considers (inaccurately perhaps) would clarify a point at issue. In these circumstances, contemporaneous notations in documents, always significant in the fact-finding process, take on an added importance.

11. Following the unsuccessful effort to refloat during the afternoon of June 30, Cdr. Edwards, in consultation with his officers, decided to pump out the sonar dome. He had previously been reluctant to do so because he was concerned that it would affect the FURER's stability while aground. Wijsmuller's salvage master Captain Handgraaf, on board the CYCLOOP, was advised of Edwards' intention, and agreed to it. Handgraaf had decided to commence the next effort at refloating the FURER at about three hours before the next high tide, predicted for 0456 hours on July 1, with a tidal range of 5.9 feet.[13] The effect of pumping out the dome's 94 tons of water, which requires several hours, is to raise the dome about 18 inches, lower the FURER's propeller about 7 inches, and raise the vessel as a whole a little over 3

---

12. S.F. ¶¶ 30, 32, 33, 38–47, 50–57; on description of sheering, see Handgraaf deposition, PX15, at pp. 26–27.

13. The tidal statistics are based upon predictors of the United States Department of Commerce, National Oceanic and Atmospheric

inches.[14] While Edwards testified at his deposition (pp. 73, 87) that they started pumping the dome at 1700 hours on June 30 and finished at about 2300, I find on the basis of the FURER's deck logs, DXA–1 and DXA–2, that pumping of the dome commenced at 1935 hours on June 30 and was still in progress at the beginning of the 0000–0400 watch on July 1.

12. Edwards went to his cabin to sleep at about 2200 hours on June 30, leaving orders with the FURER's executive officer, Lt. Cdr. Robert Burns, to wake him at midnight. At that time, the BARENDSZ and the UTRECHT were anchored astern of the FURER, each with a towline leading to bitts aboard the FURER. The UTRECHT was directly astern of the FURER, and the BARENDSZ was off the FURER's port quarter.[15] The CYCLOOP was made up "Chinese style," her bow facing the FURER's stern, on the FURER's port side. According to the CYCLOOP's log, PX18, she had been scouring sand with her engines from 1700 to 1800, and again from 1940 to 2125, when the propellers were stopped to clear away broken fenders. At 2140 the CYCLOOP began scouring again, and was ordered to stop at 2240 until the next high tide. She remained made up alongside the FURER's port side. Handgraaf testified at his deposition (p. 133) that the CYCLOOP scoured continuously from 2100 hours on June 30 until 0215 on July 1, when the FURER refloated, but I reject this testimony, given almost three years after the event, in favor of the contemporaneous log entries. The TITAN, according to her log, PX21, anchored near the FURER at 1900 hours on June 30. At 0005 on July 1 she started her engine, heaved her anchor up at 0105, made fast alongside the FURER's starboard side at 0130, and started scouring sand. Again, I accept these contemporaneous entries, and find that the TITAN comported herself as described, rejecting any contrary testimony by the witnesses.

13. While the salvors contemplated initiating a concerted effort at refloating the FURER somewhat in advance of high tide, they were partially overtaken by events. At some time during the 0000 to 0400 watch, and before the Wijsmuller tugs had begun trying to pull the FURER off the strand, the FURER was observed to be moving at the bow. Executive Officer Burns, who remained on the bridge after Edwards retired, thought he noticed "a slight up and down movement of the bow"; the time was "very, very close to about 1:30."[16] Burns went forward to the bow, where he was joined by Boatswain's Mate Robert Garcia, who had been stationed on the fantail and got a feeling "like the ship came alive again"; it also appeared to him that the BARENDSZ and UTRECHT, anchored astern of the FURER, were closer.[17] At the FURER's bow, Burns and Garcia took lead line readings. Burns testified, and I find, that when he was taking soundings on the FURER's starboard bow, a Wijsmuller tug was positioned alongside the warship's starboard side scouring sand; the tug's wash created a 60 degree angle on the lead line.[18] The vessels' log books help establish the time. The tug on the FURER's starboard side was the TITAN; her log recites that she moored alongside the FURER and started scouring sand at 0130. The FURER's deck log reports the TITAN as made up to the starboard side amidship at 0120. Burns felt "a definite up and down movement at the bow," further testified that he saw the two tugs "that had been astern of us anchored were now coming

Administration, DXA15, which plaintiff accepts; see S.F. ¶ 41.

14. These findings are based on the calculations of the Government's expert witness O'Brien, Tr. 514. There is no basic dispute on the point. Plaintiff's expert witness Searle calculated that pumping out the dome would raise the bow (more accurately, the dome itself projecting from the bow) by 16.2 inches. Tr. 306.

15. See sketch of vessels' positions, PX29, prepared during depositions of Wijsmuller witnesses at Ijmuiden in May of 1977.

16. Burns deposition, DXB, at p. 40.

17. Garcia deposition, DXD, at pp. 23–24.

18. Burns deposition, at p. 41.

forward" so that they were "almost off our bow itself," and concluded that "we were free at that time."[19] Burns wakened Edwards with a report that the FURER had refloated.[20]

14. The FURER's motions were also observed by Wijsmuller personnel. Salvage master Handgraaf, stationed on the CYCLOOP which was fastened to the FURER's port side, testified that Captain Helenigh of the CYCLOOP told him "that there was some movement in the ship [that is, the FURER] and they wanted to start for the refloating."[21] He estimated the time as around 0100.[22] Handgraaf testified that the TITAN had joined the CYCLOOP alongside the FURER "around midnight,"[23] which I cannot accept in view of the TITAN's log entry that she made fast to starboard at 0130; however, I find on the evidence of all witnesses that as the FURER's motion became more pronounced, the CYCLOOP was fastened on her port side and the TITAN was fastened to starboard. Handgraaf ordered the BARENDSZ and the UTRECHT "to pick up their anchor and start pulling as well."[24] The BARENDSZ's log, PX19, recites that she started her engines, heaved up anchor, and started to pull on her towing wire at 0145. Captain Johannes Hopman of the BARENDSZ noted that his towing wire was not pointing in the direction of the FURER, an indication that it was caught somewhere on the bottom. Hopman slowly increased power to get the wire clear; he "almost needed full power to get it clear."[25] The BARENDSZ, according to her log, was pulling at full power at 0200. Handgraaf had boarded the FURER and gone aft. He noticed movement in the FURER "as the WILLEM BARENDSZ

started pulling"; he also observed that the UTRECHT's towing wire had fouled the FURER's propeller, and ordered the UTRECHT not to pull.[26] The UTRECHT's log, PX20, shows that she raised her anchor at 0135. The log contains no reference to the UTRECHT pulling on her towing wire before being ordered to stop. Her master, H. J. Korendijk, testified that at 0135 he noticed motion in the FURER, and thereafter raised anchor, and used the UTRECHT's engines to pull the FURER "loose of the bank" for at least some time before observing that the pennant of his towing wire was fouled at the FURER's stern, which he reported to Handgraaf.[27] Korendijk's testimony, as it emerges in deposition form and through an interpreter, is obscure. I find on balancing the evidence the UTRECHT did not contribute by towing to the refloating of the FURER; her contribution was limited to such force as was generated by the catenary effect of her towline. As for the CYCLOOP and TITAN, the CYCLOOP's log, PX18, recites that at 0200 "all hands on deck, tried to pull the J.A.F. afloat." The TITAN's log, as noted, stated that she had started scouring sand at 0130. The FURER's deck log notes that at 0157: "taking tension on forward tug line." Plaintiff interprets this entry as an indication that the TITAN was scouring, which would generate a tension on the line.[28] It is equally plausible that the reference is to the CYCLOOP—the "forward tug" is not identified—which, as her log indicates, was attempting at 0200 "to pull the J.A.F. afloat." In any event, it is clear that a forward, freeing force was being generated by both these tugs.[29]

19. *Id.*, at pp. 41–42. For the reasons which follow, I do not accept the conclusion to which Burns testified at his deposition.

20. Edwards deposition, DXA, at p. 81.

21. Handgraaf deposition, PX15, at p. 129.

22. *Id.*, at p. 41.

23. *Ibid.*

24. *Ibid.*

25. Hopman deposition, PX16, at p. 20.

26. Handgraaf deposition, at p. 130.

27. Korendijk deposition, PX17, at pp. 17, 25–27, 32–33, 38, 41–42.

28. This is apparently Lt. Cdr. Burns' theory; see deposition at pp. 56–57.

29. See also Handgraaf deposition, at pp. 41–42.

15. The Government contends that "the FURER floated free in a time period of approximately 0120 to 0130 hours on July 1"; that only after she floated free were the CYCLOOP and TITAN "reactivated, moored on opposite sides and utilized to further push the FURER astern to its ultimate anchorage area"; and that neither the UTRECHT nor the BARENDSZ towed the FURER at all, their contributions being limited to having their lines "attached to the stern of the vessel and the weight of the line acting as a force assisting the astern movement of the FURER." In short, says the Government: "At the time of the freeing of the FURER there were no affirmative activities underway on the part of the four tugs."[30] That position, if sustained by the evidence, would certainly minimize Wijsmuller's contribution to the refloating, and thus reduce the amount of a salvage award. I find, however, that the FURER had not "floated free" of the strand as early as 0120 or 0130. The phrase connotes a state of total liberation from earlier confinement, so that the vessel may again maneuver freely. The FURER did not recapture that state of grace until after 0200 on July 1. All the logs and contemporaneous reports attest to that fact. The CYCLOOP's log recites: "0215 J.A.F. afloat, and started to pull the ship to an anchor position . . ." The log of the TITAN states: "0215 J.A.F. refloated, towing vessel in direction 300° into deep waters." The log of the BARENDSZ states: "0215 J.A.F. afloat and towing her into deep water." The log of the UTRECHT states: "0210 J.A.F. afloat." This cannot be disregarded as a conspiracy of false entries by Wijsmuller personnel. The FURER's own log is in full accord. Lt. Cdr. Robert Norris, an engineering officer, was on watch on deck from 2348 hours on

June 30 to 0213 hours on July 1. When motion was observed in the FURER, Lt. W. F. Bassett, a deck officer, was called to relieve Norris, who returned to the engine room. Bassett reached the FURER's bridge at about 0200 and relieved Norris at the watch at 0213.[31] Bassett's first entry in the deck log, PXA–2, is: "0213 Assumed the watch. Aground as before." The next entry, at 0220 reads: "Believe there is up and down movement in the bow suggesting ship is free." The "situation report" which was sent from the FURER to other naval authorities states that the vessel "floated free" at 0220 on July 1.[32] The seagoing witnesses, Dutch and American, who prepared these contemporaneous reports, presumably knew when the FURER floated free of the strand. With one voice, they described that event as having occurred subsequent to 0200. The several notations range between 0210 and 0220. The discrepancies are insignificant. What is significant is that the contemporaneous entries are fatal to the Government's contention that the FURER floated free as early as 0120 or 0130. The efforts of the Navy witnesses, in depositions taken within the litigation context, to establish an earlier time of floating free are unpersuasive. I accept that the FURER's personnel observed a motion in the bow at about 0130; those on board the Dutch tugs observed the same phenomenon. That motion resulted from the lightening effect of pumping out the sonar dome. But pumping out the dome would raise the bow only about 18 inches. That would not be sufficient to float the vessel free of the strand. The dome had been buried in the sand at least to a depth of five feet.[33] She had not floated free, even with tug assistance, at 1620 hours on June 30, when the predicted high tide was 6.0 feet.[34] The Government

---

30. Main brief after trial at pp. 10–11.

31. Norris deposition, DXC, at pp. 37–40.

32. DXA18.

33. The Dutch Navy divers reported to Executive Officer Burns that the FURER was aground by the dome for a depth of four to six feet. Burns deposition, at p. 24. Halfweeg

was advised that the grounded depth was six feet. Deposition at p. 56. The parties, in their calculations, have used a depth of five feet. Judging by the unsuccessful efforts to float the vessel, the depth was probably six feet.

34. S.F. ¶ 41.

argues in its brief (p. 9) that the FURER floated free "as a result of the bow rising 17 inches due to the pumping of the dome and the presence of additional water of approximately 1½ meters due to oncoming heavier winds and seas that were predicted for the afternoon of July 1." But there is no evidence from which I could find that 1½ meters of additional, storm-generateed water were assisting the FURER's floatation at 0130 on July 1.[35] The fact of the matter is that pumping out the FURER's sonar dome was simply insufficient to refloat the vessel at the time in question. The FURER floated free, shortly after 0210 on July 1, as the result of several factors: prior scouring of sand by the Wijsmuller tugs; a possible weakening of the sand "nest" imprisoning the dome by the prior, unsuccessful salvage efforts; pulling by the BARENDSZ when the motions of the FURER were observed; the forward thrust of the CYCLOOP and the TITAN, moored to the port and starboard sides of the FURER, respectively; and the increased floatation realized by the pumping of the sonar dome. Pumping of the dome, in and of itself, would not have been sufficient to cause the FURER to float free.

16. The events that transpired subsequent to the freeing of the FURER from the strand are not in dispute, and are summarized in the Statement of Agreed Facts.

Edwards indicated to Handgraaf where he wished the FURER to be towed. The Wijsmuller tugs towed the FURER to a place of safety, where it anchored at about 0303 hours on July 1. The TITAN was sent to Ijmuiden to pick up Wijsmuller divers and cutting gear to clear the UTRECHT's towing wire; but after the TITAN left, a Dutch Navy diving boat arrived with divers who were to inspect the FURER for underwater damage, and, using the FURER's cutting gear, these divers freed the warship's propeller from the UTRECHT's wire which was entangled in it. The CYCLOOP and WILLEM BARENDSZ stood by until the UTRECHT's wire had been cut free. The BARENDSZ was dismissed from the scene at 0730 hours and returned to Ijmuiden, arriving in berth at 1055. A redelivery certificate, under the Lloyd's Open Form salvage agreement was executed at about 0755 hours. The CYCLOOP departed the scene at 0805, and arrived in berth at Ijmuiden at 1245. The TITAN had arrived in berth at 0725. The UTRECHT stood by until 0835, when it returned to its salvage station, arriving there at 1738. The Dutch Navy divers reported that there was no evidence of underwater damage to the FURER, except that the ends of two of the propeller blades had been slightly damaged. The FURER's crew conducted steering and engine tests, which were satisfactory. The

---

**35.** The only support the Government cites in the record for that particular assertion is the Handgraaf deposition at pp. 131–132. The witness testified:

". . . but, as we know, before you get bad weather in Holland, before the bad weather actually comes and the weather is out of the westerly direction, you have an additional rise at high water times."
Q. And did you get that additional rise at this time? This is approximately 02.00 hours."
A. "I didn't know that we were expecting bad weather, so I didn't calculate that we could expect the additional rise."
Q. "At that time there was no indication of bad weather?"
A. "No, not to my information."
Q. "Do you think you got such an additional rise at that time?"
A. "I think we got it."
Q. "So that was a help in freeing the vessel?"

A. "Yes."
Q. "How much additional rise do you think you got?"
A. "Most of the time they gave warnings between ½ a metre to 1 metre. It all depends on how much wind they expect."
Q. "Did you feel that that was just enough to bring the vessel off the pivot?"
A. "Just to give her enough clearance to be towed off."

The usual "warning" given in respect of approaching bad weather is "½ a metre to 1 metre," not 1½ metres. Handgraaf thinks there was some additional rise of water at about 0200, and that it was a factor in giving the FURER "enough clearance *to be towed off.*" (emphasis added). The fact of the matter is that the vessel *was* towed off; the rising water may have been a factor, but not to the extent suggested by the Government.

FURER got underway for Denmark at 0757.[36]

17. The parties dispute the degree of danger from which the FURER was rescued. That is an important element in determining the salvage award. I accept the testimony of the Government's expert witness John O'Brien, employed by the Naval Ships Engineer Center, that in her position "aground somewhere by the bow," and in the conditions of current and seas prevailing at the time, the FURER was in no particular physical danger from the time of grounding to refloating. O'Brien's testimony was based on his calculations of such technical factors as "grounding load" and "still water bending moment." [37] The distillation of his evidence is that the FURER was strong enough to withstand any pressure resulting from the sonar dome and bow area having grounded, and the rest of the vessel afloat, in calm weather. But this is hardly dispositive of the quantum of risk. Plaintiff's expert witness Captain William Searle, a salvage expert and former Navy Supervisor of Salvage, testified that in view of the predicted deteriorating weather, there was a danger of the FURER pivoting on the grounded sonar dome and broaching, that is, lying parallel with the sandbar and presenting her entire side to the direction from which the weather was coming.[38] If a vessel broaches, Searle testified, the sand builds up around the entire hull, the pounding of the waves can carry her further "up the beach," there is a risk of damage to machinery, "so far as the salvage operation is concerned, the situation would have gotten dramatically worse," and, if sand is scoured away from the bow and stern but remains at the midbody, a bending or "hogging" effect results which places a strain on the hull.[39] The risks attendant upon broaching are not controverted by the Government's expert; O'Brien made no calculations of the stress upon the FURER had she broached, admitted the stress would be greater, and agreed that broaching should be avoided if possible.[40] The Government's

36. See S.F. ¶¶ 66–77.

37. Tr. 492–500.

38. Tr. 200–204.

39. Tr. 205–209. This was a particular hazard on the Haaksgrunden Bank. The sand in that area of the North Sea is relatively fluid, and fills in around the hull of a stranded vessel almost immediately after she has come to rest. There is quite a steep rise to the bank where the FURER grounded, and the predicted gale winds for July 1, 1974 (see fn. 42, *post*) would render low water lower than normal, and high water higher than normal. The threat to the FURER would lie in being lifted up and banged down on the sandbank, coupled with increased scouring of the sand by abnormal currents. Halfweeg deposition, at pp. 14–15. If the scouring effect were unevenly distributed over the FURER's hull, the risk of "hogging" testified to by Searle arises.

40. O'Brien testified:
BY THE COURT:
Q. "Could you describe generally that position in relation to the land configuration and the position of the ship?"
A. "I don't really think what I'm trying to say is that I picked a particular position in reference to tides and currents. What I said is that the ship was grounded square on the bottom and then I put my forces in the direction of the maximum effect on the ship as far as creating high stresses."

Q. "Yes. So that the position that you were concerned with, and which you based your calculations upon, was a position with the vessel grounded at the bow and then the rest of the hull afloat, is that so?"
A. "Yes."
Q. "Now, I understand that you gave some consideration to a broached position, is that right?"
A. "Just—not any detailed analysis, just some thought to it more than anything else."
Q. "You made no calculations of strength comparable to the ones you have told us about, but relating to a broached position?"
A. "No, I didn't."
Q. "On the basis of your examination of the evidence and your knowledge of the case, and from the point of view of your own concern, namely, the strength of the vessel, have you an opinion as to whether coming into a broached position would bring about a situation of greater danger to the vessel?"
A. "When you say greater danger, you mean from the standpoint of strength?"
Q. "Yes."
A. "I would admit to the possibility that the stresses in the hull would be greater than they would be in the—the way I examined it, just because you probably, if you got into that position, I would assume that you might not have as much water bouyancy because

principal argument on this aspect of the case is that there was no danger of broaching because the FURER, having pumped out the sonar dome, would have floated free on her own at the next full high tide, at 0456 on July 1. The Government called no salvage expert to contradict Searle (O'Brien, a civilian technician, had no seagoing or salvage experience); the point was sought to be established on cross examination. The proposition is a close one. Searle calculated that the elevation achieved by the prior high tide at 1620 on June 30 was 4.7 feet; the FURER, with her sonar dome still full of water, could not be freed even with tug assistance. The pumping of the dome raised the bow by 18 inches. While that elevation was not sufficient to free the FURER at 0210 on July 1, on the rising tide, it might have done so at full high tide at 0450, which was predicted to be 5.9 feet. Searle appeared to concede the possibility.[41] However, accepting *arguendo* that the FURER, even if unattended by plaintiff's tugs, would have floated free on the high tide by virtue of pumping out the sonar dome, it does not follow that she would be free of danger. Raising the bow lowers the stern. The propeller and rudder thus come closer to the sand. To back off the sandbar, Edwards would have had to place the FURER's engines astern. His testimony shows that he was reluctant to do that. With engines astern, the stern tends to "squat" lower in the water, closer to the bottom. Furthermore, the FURER backs to port; that is, her stern moves to port and the bow to starboard. The current at high tide runs in a northerly direction. While the velocity at high tide was only .9 knots, this would be

an additional factor operating upon the FURER's starboard side, inclining her to broach port side to the sandbar unless she was in full maneuvering control as soon as the bow came clear. In these circumstances, Searle envisioned a continued risk of broaching; he testified saltily:

> "What I said was that with the port thrust of the propeller and still with the .9 knots this way, the chances of broaching are high because he's dragging right up the side of the gosh darn sandbar and he ain't got no way of maneuvering out here." Tr. 322.

I accept this testimony. The Government suggested in further cross examination of Searle that smaller Dutch Navy tugs could have assisted the FURER in keeping control when the warship, her dome pumped out, hypothetically refloated on the high tide. That is a revisionist theory which I disregard. The Dutch Navy had proclaimed itself inadequate to help the FURER and advised Cdr. Edwards to obtain civilian assistance, which Edwards did. I am not concerned with what might have happened if the Dutch Navy had continued to give assistance without plaintiff's presence. As the result of Edwards' perfectly sensible decision, the Dutch Navy disappears from the drama. The question is whether Wijsmuller's efforts preserved the FURER from risk of further expense or damage. I find that there was an appreciable danger to the FURER broaching, if Wijsmuller had not assisted in freeing her. Had the FURER broached, the worsening weather would have placed her in a position of considerably greater peril.[42] It cannot be said that Wijs-

you probably would have lifted the ship higher on the sand."
Q. "Let me put it to you this way. From your perspective, is broaching, in these circumstances, something that you would prefer to see the vessel avoid?"
A. "Yes." Tr. 532–534.

**41.** Tr. 312, 318–319.

**42.** The local weather forecast for Haaksgrunden Bank, at 52° 58′ N and 04° 35′ E, for July 1 was:
"South to south west 10 to 15 kts (force 3 or 4) increasing to 25 kts (force 6) during morn-

ing veering westerly and increasing to 35 kts (gale 8) during early afternoon. Rain at times at first but becoming a more showery type with local thunderstorms later. Sea waves mainly north westerly 2 to 3 metres (Moderate to Rough). Mainly good visibility." GX8.
The CYCLOOP, returning to Ijmuiden during the morning of July 1, encountered a freshening wind, pitched heavily, and at 1015 hours had to reduce engine revolutions due to high seas. See log, PX18. The prediction of worsening weather was apparently accurate.

muller saved the FURER from certain severe damage or loss, but the plaintiff's efforts played a substantial part in preserving the FURER from a considerable peril.

18. The total times devoted by the four Wijsmuller tugs to the salvage operation, including time steaming to the site and returning to port or salvage station, are as follows: CYCLOOP, 0400 on June 30 to 1245 on July 1; WILLEM BARENDSZ, 1310 on June 30 to 1055 on July 1; UTRECHT, 0855 on June 30 to 1738 on July 1; TITAN, 0415 on June 30 to 0725 on July 1.[43] At the pertinent times Wijsmuller charged, on a daily contract towage basis, $1966.55 for the CYCLOOP and TITAN, $2556.52 for the UTRECHT, and $2753.17 for the WILLEM BARENDSZ, with a possible additional profit factor of up to 30% depending on market conditions.[44]

## DISCUSSION

### A. The Award

■ The "main ingredients" of a salvage award under American law were declared in *The Blackwall*, 77 U.S. (10 Wall.) 1, 13–14, 19 L.Ed. 870 (1870):

"(1) The labor expended by the salvors in rendering the salvage service.

"(2) The promptitude, skill and energy displayed in rendering the service and saving the property.

"(3) The value of the property employed by the salvors rendering the service and the danger to which such property was exposed.

"(4) The risk incurred by the salvors in securing the property from the impending peril.

"(5) The value of the property saved.

"(6) The degree of danger from which the property was rescued."

A leading commentator has rearranged these elements, in order of descending relative importance, as follows: the degree of danger from which the property was rescued; the value of the rescued property; the risk incurred by the salvors; the sal-

vors' promptitude, skill and energy; the value of the property employed by the salvors; and the time and labor expended by the salvors. Norris, *Law of Salvage* (1958) at § 237, pp. 376–377.

In the case at bar, the last four of these elements, as rearranged by Norris, require little discussion. There was no particular risk incurred by the Wijsmuller tugs during the salvage operation, apart from the risks inherent in a situation where vessels are maneuvering together in an area of restricted maneuverability. The Wijsmuller tugs responded promptly to the FURER's request for assistance, and while the salvors performed with competence, no particular ingenuity or skill was required by the salvors' task, or displayed in its execution. The value of the salvors' property was, as previously found, considerable. The time and labor expended by the salvors in rendering the salvage service was relatively minor.

There remain for consideration the two most significant *Blackwall* elements: the degree of danger from which the FURER was rescued, and her value. Two additional factors, also established by caselaw, play a part in determining the amount of the salvage award: the contribution of individuals other than the salvors to the overall successful effort; and the status of Wijsmuller, disputed at least to a degree by the parties, as a professional salvor.

■ As to the element of danger, I have found that Wijsmuller's efforts played a substantial part in preserving the FURER from a considerable peril. American courts recognize that when a vessel strands, she is in a position of inherent danger. In *Navigazione Generale Italiana v. Spencer Kellogg & Sons, Inc.*, 92 F.2d 41, 44 (2d Cir. 1936), *cert. denied*, 302 U.S. 751, 58 S.Ct. 271, 82 L.Ed. 580 (1937), the Second Circuit observed in an opinion by Judge Augustus Hand that:

". . . When a vessel is stranded, she and her cargo are practically always in a

---

43. See logs, PX18, 19, 20, 21.

44. Wijsmuller, Tr. 118–122; PX9.

substantial peril. Such a vessel is helpless because she cannot pursue her intended voyage or deal effectively with any emergency which may arise."

The degree of peril resulting from a stranding depends, of course, upon the circumstances of the case; clearly, "every stranding may not give rise to a substantial peril in the factual sense," *Sobonis v. Steam Tanker National Defender*, 298 F.Supp. 631, 636 (S.D.N.Y.1969). In the case at bar, the potential of an emergency was present because of the predicted westerly gales on July 1, which together with the FURER's vulnerability to broaching could have placed her in a far more serious situation on the strand. For the reasons stated in the Findings of Fact, the FURER could not without risk have freed herself by emptying the sonar dome and maneuvering astern at high tide. The element of substantial peril is present in this case.

█ The value of the FURER requires discussion because it is so high. I have found a salved value of $23,400,000. No reported American case involves a salved value even approximating that figure. There is only one comparable English decision: *The Queen Elizabeth*, 82 Lloyd's List L.R. 803 (1949), in which the famous Cunard liner suffered the embarrassment of grounding in the approaches to the port of Southampton on a voyage from the United States. The agreed value of ship and cargo was £6,208,000. The vessel was freed from the strand the following day, following an initial unsuccessful effort. Several factors contributed to the refloating: the Queen Elizabeth had lightened her bow by shifting and discharging of weights aboard; she was using her own engines astern, and a number of tugs including those of the salvors, were towing at the time she came free. Thus the case is closely analogous to the circumstances of the present one. In dealing specifically with the Queen Elizabeth's very high value, Mr. Justice Willmer stated that so great a salved value furnished "no reason to depart" from the general principles involved in determining a salvage award—principles which are similar to those declared in American law in *The*

*Blackwall.* In Justice Willmer's view, in a case where a "bare possibility" of a much more serious loss is involved, the extraordinary magnitude of the value of the salved property has a limited, but nonetheless real, effect upon the size of the salvage award. Mr. Justice Willmer held on the point:

"I am not saying that you can measure salvage awards as sums in arithmetical proportion in relation to the salved property when you have values of the magnitude that you have in this case, but equally it would not, I think, be right to say that, where you have a value of this size, the addition of a few millions or the subtraction of a few millions would make no difference whatsoever. So long as even an outside chance of anything in the nature of total loss remains, then I think that the increase of value must involve some, although possibly not great, increase in the salved award over and above what might have been awarded had the value been much smaller." 82 Lloyd's List L.Rep. at 821.

I agree with this analysis, and will attempt to apply it in determining the salvage award in the case at bar. I have concluded, however, that the risk of a more serious loss in the case at bar rises to a somewhat higher level than that of "a bare possibility."

█ On the issue of the contribution of others to the overall salvage effort, it is well recognized in American law that where a number of groups combine their efforts to salve property, the court must determine the value of each individual contribution to the overall effort. "The fact that certain salvors either cannot or do not claim salvage inures to the benefit of the owners of the salved property, and does not increase the fair proportion of the claiming salvors." *The M/T Norseman*, 1967 A.M.C. 1531, 1545 (D.P.R.1967), and cases there cited. In the case at bar, the other individuals present on the scene were Royal Dutch Navy personnel, and the officers and crew of the FURER herself. While the Dutch Navy left a liaison officer on board the FURER, and

generally maintained a helpful posture, the Navy personnel did not contribute materially to the salvage effort. That is not the case with respect to the FURER's officers and crew. The FURER's crew handled all of the lines from the salvage tugs on board the FURER—salvage master Handgraaf was the only Wijsmuller employee who boarded the FURER during the salvage operation (S.F. ¶ 80)—and the contributory effect of the pumping of the sonar dome to the refloating of the vessel has already been observed. It is a factor which the Government is entitled to have taken into consideration.

■ The final pertinent factor is Wijsmuller's status as a professional salvor. Professional salvors, who at considerable effort and expense hold themselves in readiness to assist lives and property in peril at sea, necessarily incurring thereby indefinite periods of inactivity, have long been regarded by the American courts as appropriate recipients of liberal salvage awards. The liberality is a reflection of the public service rendered by such companies. The underlying rationale is stated in many cases, of which the decision of the Second Circuit in *The Lamington*, 86 F. 675, 684 (2d Cir. 1898), is typical:

"The skill that comes from long experience, joined with more powerful machinery, and devices specially adapted to the purpose in hand, are of more service to an imperiled vessel than is the aid which may be expected from a chance rescuer. To provide such skill, machinery, and appliances, and to keep them ready for instant service, though they may be called for but occasionally, is now regarded as a meritorious act, calling for a liberal award."

The rule is the same in England, as Mr. Justice Willmer makes plain in his discussion in *The Queen Elizabeth, supra*, at 821–822:

"In the case of the *Bustler* and the *Metinda III* I have tried to give effect to the fact that they are primarily and in the first instance, professional salvors. As Sir William McNair put it, salvage awards to such plaintiffs are bread and butter, whereas to the other plaintiffs claiming in this case they may more properly be described as jam. I need not refer to authority for the proposition, which is well-established, that salvors of this character are entitled to a special measure of generosity."

In today's circumstances, when the potentially disastrous impact upon the environment of maritime casualties involving increasingly large vessels has unhappily become a matter of common knowledge, the importance of maintaining professional salvage capabilities around the world is greater, not less.

In the case at bar, the Government contends that Wijsmuller is not entitled to the liberality owing to a professional salvor. Emphasis is laid upon the fact that Wijsmuller, in addition to maintaining rescue tugs on salvage stations, also engaged in contract towage and other maritime work not related to salvage. The Government argues that a professional salvor's salvage vessels must always be ready to respond to distress calls, citing *The Camanche*, 75 U.S. (8 Wall.) 448, 475, 19 L.Ed. 397 (1869), and *Coast Wrecking Co. v. Phoenix Insurance Co.*, 13 F. 127, 135 (E.D.N.Y.1882); that the "sole purpose" of the professional salvor must be to perform salvage, citing *Merritt & Chapman v. United States*, 1927 A.M.C. 708–710 (Ct.Cls.1927); and that the category of professional salvor should not include a party "not regularly engaged in the business," nor "the harbor or deep sea tug operator who is a part-time salvor under contract," citing Norris, *op. cit. supra*, at § 176, pp. 285–286.

I have considered these authorities, but am not persuaded that they deprive Wijsmuller of the favored status of a professional salvor. Wijsmuller devoted a substantial measure of its resources to salvage, including keeping salvage tugs on station. Other occupations were sought for certain of its vessels. The issue is whether the company had to devote itself exclusively to salvage to qualify for the professional salvor's status. While there is in *The Cam-*

*anche* a passing reference to cases involving the owners of vessels specially built for salvage "and devoted exclusively to that particular employment," 75 U.S. (8 Wall.) at 475, the precise question presented here was neither raised nor decided. In *Coast Wrecking Co.* the Court, awarding 50 percent of salved valves, observed of the professional salvor that its equipment, "with steamers and pumps and wrecking material and skilled men, and its readiness to act on a moment's notice, must be considered, involving, as it does, large investments and expenses, which go on as well while there is no employment." 13 F. at 135. To the extent that Wijsmuller held its equipment in that state of readiness and availability, the same considerations apply; *Coast Wrecking* does not suggest that the activity must exclude all others. In *Merritt & Chapman*, salvage was the plaintiff's exclusive business, but nothing in the opinion suggests that this is necessary to the special consideration owing to a professional salvor; indeed, the Court of Claims did not even mention that factor when it summarized the elements underlying its award. 1927 A.M.C. at 711. The discussion in Norris, relied upon in support of the exclusivity argument, actually reads:

> "As to the determination of who is a professional salvor, that would depend largely upon the facts in each case. Generally, a professional salvor is regarded as an individual, company or corporation devoted to the business of rescuing ships and property in distress on navigable waters. The category should not include the chance stranger who becomes a salvor on an isolated occasion but is not regularly engaged in the business. Neither should it include the harbor or deep-sea tug operator who is a part-time salvor under contract, performing what he sometimes designates as 'distress towage.'" § 176 at pp. 285–6.

Wijsmuller qualifies as a "professional salvor," at least in substantial part, in the light of this discussion, as opposed to a "chance stranger" or the tug operator "who is a part-time salvor *under contract*" (emphasis added). The distinction lies in Wijs-muller's maintenance of vessels on salvage station, equipped and ready to deal with a variety of maritime casualties. More recently, the Second Circuit indicated that the exclusive devotion of a company's resources to salvage is not a condition precedent to recognition of a professional salvor's favored status. In *Nicholas E. Vernicos Shipping Co., Ltd. v. United States,* 349 F.2d 465, 472 (2d Cir. 1965), the libelant towing companies rendered services to American naval vessels caught in a squall at the port of Piraeus. Judge Friendly said on the point at issue:

> "The Government argues that libelants are less deserving because the tugs were not reserved exclusively for salvage work; but there is nothing to show that, despite these other assignments, the libelants did not maintain on station at Piraeus a number of tugs adequate to meet the reasonable needs of shipping in that harbor. The record contains no evidence how often the libelants' vessels were able to earn salvage or in what amounts. In view of the traditional principle of liberality in awards to professional salvors, *The Lamington*, 86 F. 675 (2 Cir. 1898); The Glengyle, supra, a substantial award was warranted."

In my judgment, a company is entitled to the special consideration afforded a professional salvor if, on an ongoing basis, a substantial measure of its resources is devoted to salvage services and readiness; and that, in consequence, the company incurs, during periods of inactivity, that *pro bono publico* expense which is the rationale for the special consideration. Wijsmuller qualifies under those criteria. The best argument the Government can make is that, in respect of those vessels used in the salvage effort which also had other occupations, there should be a partial dilution of the professional salvor's special consideration. The UTRECHT would not appear to fall in that category; the evidence indicates that she was almost exclusively used for salvage duty. The other tugs, particularly the harbor tugs CYCLOOP and TITAN, while having salvage capabilities, also

found other forms of employment. I shall endeavor to give this diluted dilution as much effect as is just.

■ I come, therefore, to a calculation of a reasonable salvage award. "Calculation" is not perhaps an apt word; it connotes elements of precision and mathematical accuracy which are essentially foreign to the admiralty court's application of general principles to an infinite variety of circumstances. One court, with a refreshing absence of institutional pride, characterized its salvage award as "an intelligent guess." *The Rescue v. The Tug George B. Roberts,* 64 F. 139, 140 (D.C.Pa.1894). Precedent is of limited value. "Rarely, if ever, are two salvage cases precisely alike and for that reason salvage awards in other cases can seldom be looked to as dependable precedent." Norris, *op. cit. supra,* at § 239, p. 378. That author adds, however: "Whenever the facts are nearly parallel to other salvage cases the latter may be referred to, but not as a rigid yardstick." *Ibid.*

*The Queen Elizabeth, supra,* closely parallels the case at bar, and I shall use the analysis and award of Mr. Justice Willmer, an experienced English judge, as a flexible—not rigid—yardstick. This is permissible because the English courts look to the same general elements in computing a salvage award as do American courts under *The Blackwall, supra.* See the leading English text, Kennedy, *The Law of Civil Salvage* (1958), at pp. 173–174.

The QUEEN ELIZABETH was stranded by the bow for a time comparable to that of the FURER. After an initial unsuccessful effort, she was refloated, on a rising tide, by the combined efforts of a number of tugs and her own resources (shifting of weights so as to lighten the bow, and placing her engines astern). The judge had to consider the issues presented by the vessel's exceptionally high salved value, and the status of professional salvors who contributed to the overall effort. Certain contributors to the salvage operation did not claim: sixteen tugs were towing, but the owners of only twelve of them presented salvage claims. 82 Lloyd's List L.Rep. at 816. Two of the tugs were owned by a professional salvage company, one of whose masters boarded the QUEEN ELIZABETH as salvage coordinator. *Id.* at 807, 808. All these factors are present in the case at bar. Against salved values of £6,208,000, Mr. Justice Willmer made salvage awards totalling £43,500. Had all the tug owners been professional salvors, the total would undoubtedly have been higher, under the judge's ruling in respect of professional salvors quoted at p. 172 *ante;* as it was, the owner of the two professional salvage tugs received £15,000 of the £43,500 total. It is fair to assume that if all the assisting tugs had been owned by professional salvors, the awards would have totalled at least £50,000, quite possibly more. £50,000 is an amount somewhat less than one percent of total salved values.

There are factors in the case at bar which militate in favor of a higher percentage of salved values than that awarded in *The Queen Elizabeth.* All the tugs which assisted the FURER belonged to a company which, in substantial degree, was a professional salvor. Secondly, the predicted westerly gales on July 1 introduced a greater threat to the FURER from natural sources than the QUEEN ELIZABETH faced. In these circumstances, I have considered whether an award of one percent of salved value would be reasonable in this case. On the FURER's salved value of $23,400,000, that would result in an award of $234,000.

Balancing all the circumstances, however, I conclude that an award of that magnitude would not be justified. The FURER's action in pumping out her sonar dome contributed more substantially to the freeing of that vessel than did the actions taken by the QUEEN ELIZABETH to free herself, as I understand the English court's analysis of the facts. The FURER was, in essence, grounded by the sonar dome; and the pumping out of the dome had a significant effect upon the root cause of the vessel's imprisonment. While I have found that pumping out the dome was not, and could not have been, the sole cause of the FURER refloating after 0200 on July 1, the possibili-

ty .exists that she might have floated free, by virtue of pumping out the dome, upon the full high tide two hours later; although, as I have also found, the FURER would have found herself in a potentially hazardous situation, even in those circumstances, if tugs had not been on hand to assist her.

Considering all these factors, applying the criteria of *The Blackwall* as best I can, and finally arriving at what one hopes will be regarded at least by some as "an intelligent guess," I conclude that a salvage award of $175,000 is reasonable in respect of the salvage services rendered by Wijsmuller to the FURER on June 30 and July 1, 1974.

■ I have endeavored to measure this award against the more recent pronouncements of the Second Circuit, but find relatively little guidance: not, of course, because of the quality of that tribunal's opinions, but because the Court has not written on the subject frequently in recent years, and in any event, as noted *ante*, salvage awards in other cases are of limited precedential value, in the absence of those rather startling similarities which appear between *The Queen Elizabeth* and the case at bar. In *Lago Oil and Transport Company, Ltd. v. United States*, 232 F.2d 238, 240 (2d Cir. 1956), the Second Circuit stated generally that: "A stingy award to a salvor contravenes good public policy." The statement summarizes the general rule, but the circumstances of the case are entirely different from those at bar. As the Government points out in its brief, in the two most recent Second Circuit salvage cases, *W. E. Rippon & Son v. United States*, 348 F.2d 627 (2d Cir. 1965), and *Nicholas E. Vernicos Shipping Co., Ltd. v. United States, supra*, the Second Circuit reduced salvage awards made by the district court; I have considered these cases with respectful attention. In *Rippon*, a naval vessel, the OCKLAWAHA, ran aground on a reef off Tripoli Harbor, Libya. The plaintiff company had available in the area certain useful equipment, such as launches and a derrick barge, and personnel including a professional diver. The government salvage supervi-

sor summoned a Rippon diver to determine the ship's position on the reef; and, with the aid of the Rippon derrick barge, the diver then placed two anchors off the vessel's port quarter, to keep her from broaching to—in other words, to guard against the risk emphasized by plaintiff's expert witness Searle in the case at bar. Rippon was, however, unable to contribute at all to the eventual refloating of the stranded vessel: she was finally refloated, after having been aground for five days, by a combination of higher than normal tides; the pulling power of other naval vessels which came to assist; the engines of the OCKLAWAHA herself; and the supervisory skill of a professional salvage director. The district court, asked to assess the contribution of Rippon to the overall salvage effort, awarded Rippon $45,230.53. The Second Circuit, while recognizing the gravity of the risk to the OCKLAWAHA while stranded, held that such an award in respect of Rippon's contribution was excessive. Judge Moore observed:

> "Thus, a realistic view from that enviable position of hindsight, reveals that Rippon put out two anchors on the first day and then withdrew its barge, that its equipment was wholly unable to free the Ocklawaha, and that three large Navy vessels under the directional skill of Captain Shepherd and a fortuitous high tide were required to float the vessel from the reef." 348 F.2d at 629.

In these circumstances, the Second Circuit reduced Rippon's award to $22,730.53.

In *Vernicos, supra*, the facts are more fully stated in the opinion of the district court, 223 F.Supp. 116 (S.D.N.Y.1963). Two U. S. naval store ships were moored, one alongside the other and that other to a quay, in the port of Piraeus. A sudden and violent squall occurred. The lines holding the vessels to the quay parted. The interlocked ships, now held only by the anchors of one of them, were swung towards possible collision with a shore structure; however, that motion was checked by further use of the vessels' anchors. Assistance was requested from the plaintiff's tugs; when

the tugs arrived, an hour later, they found the naval vessels stationary, riding on all anchors, in calm waters, although still displaying a distress signal. The tugs returned the vessels to their original berths, the vessels having moved some 150 to 200 yards from their original position, and assisted in securing them with reenforced lines. Shortly thereafter, the winds again began to increase, and the master of one of the naval vessels asked plaintiff's tugs to return and stand by. The tugs did so, at one point pushing against the side of one of the naval vessels, to relieve the strain on her lines. Several hours later, the tugs were again discharged, the winds having abated. In these circumstances, the district judge concluded that the case was one of "low order" salvage, and measured his award by the monthly expenses incurred by the owner of the tugs. He awarded three months' expenses in respect of the two assisting tugs, which resulted in an award of $13,274.34 to one, and $10,824.36 to the other. On appeal, the Second Circuit reduced the awards from three months' expenses to two months' expenses.

I find nothing in these cases that would brand as excessive an award of $175,000 in the circumstances of the case at bar. *Vernicos* is quite dissimilar on the facts, in respect of both the degree of danger confronted, and the nature of the salvors' services. *Rippon* is closer on the facts, since the salved vessels had stranded, and was in danger of broaching. Considering the peripheral and relatively minor contributions of the plaintiff salvor in *Rippon*, the Court of Appeals' award of $22,730.53 to that plaintiff is not, in my judgment, inconsistent with an award of $175,000 to Wijsmuller in the instant case. It must also be recognized that none of the salved vessels in *Vernicos* and *Rippon* has the exceptionally high salved value presented by the FURER.

B. *The Rate of Exchange*

■ I conclude, therefore, that an award of $175,000 reasonably reflects the value of the services rendered by Wijsmuller to the United States at the time in

question. The remaining issue is whether that amount should be increased, as Wijsmuller contends, so as to offset the decline in the value of the dollar in relation to the Dutch guilder since 1974. This Court, of course, can render judgment only in dollars. Wijsmuller observes that: "A judgment in dollars will be worth about 23% less in guilders than the same sum was worth in 1974." (Main brief at p. 57). The decline in the dollar's value is not disputed by the Government. The question is whether the Court should give any consideration to that decline, in fashioning its judgment. The parties have not cited, nor has the Court found, any American salvage decision which addresses this issue.

Wijsmuller contends it is "entitled to an uplift in the award to offset the decline in the value of the United States dollar in relation to the Dutch guilder." (*Id.* at p. 72). Wijsmuller bases that contention upon three grounds: the "usual rules of law relating to currency exchange"; the "policy underlying the fixing of salvage awards"; and the salvage agreement signed by Cdr. Edwards of the FURER on June 30, 1974, upon one of whose provisions Wijsmuller continues to rely.

This last contention, insofar as it attempts to assert a claim against the United States based upon a specific contractual term, may be promptly rejected. It is quite true that Clause 17 of the Lloyd's Standard Form of Salvage Agreement which Cdr. Edwards signed (PX1) provides:

"In considering what sums of money have been expended by the Contractor in rendering the services and/or in fixing the amount of the Award or Award on Appeal the Arbitrator or Arbitrator or Arbitrators on Appeal shall to such an extent and in so far as it may be fair and just in all the circumstances give effect to any change or changes in the value of money or rates of exchange which may have occurred between the completion of the services and the date on which the Award or the Award on Appeal is made."

Wijsmuller argues that, notwithstanding this Court's prior rejection of Wijsmuller's

right to arbitrate its salvage claim under this contract, the quoted provision should be binding upon the United States because it is severable from the arbitration clause in the contract. But Wijsmuller construes this Court's prior opinion, and the authorities upon which it was based, too narrowly. The basis of the prior decision was that Edwards had no authority to bind the United States to the terms of the contract. 1976 A.M.C. at 2518, 2519. To be sure, the precise point at issue was whether, by virtue of a different provision in the contract, the United States could be required to arbitrate plaintiff's claim against its will. That question necessarily led to considerations of sovereign immunity from suit. However, it is a general rule of law that the Government is not contractually bound by the unauthorized acts of its agents, *Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947); and the implementation of that rule is not limited to cases which turn upon the forum in which a claim against the United States may be asserted. The rule also applies in cases where contractual claims are asserted against the Government, in a forum of unquestioned jurisdiction. See, e. g., *State of Arizona v. United States*, 575 F.2d 855 (Ct. Cl.1978), in which the Court of Claims, in a suit against the United States for an alleged breach of contractual obligations, restated the general rule:

> "Plaintiff, to recover on a purported contract with the Government, must show that those who acted for the Government acted within their authority." 575 F.2d at 859.

In the case at bar, no basis appears for asserting that Cdr. Edwards had the authority to bind the United States to any provision of the salvage agreement. Wijsmuller cites authority for the proposition that the master of a commercial vessel has authority to enter into a contract to procure salvage services, but that familiar principle is of no relevance to a contractual claim against the Government.

Wijsmuller also appeals to the "usual rules of law relating to currency exchange,"

and in that regard offers an extended discussion of commercial cases in which the court was required to choose between the rate of exchange prevailing on the date the debt accrued, as opposed to the date of judgment. Prominent mention is made of *Hicks v. Guinness*, 269 U.S. 71, 46 S.Ct. 46, 70 L.Ed. 168 (1925), *Sutherland v. Mayer*, 271 U.S. 272, 46 S.Ct. 538, 70 L.Ed. 943 (1926), and *Die Deutsche Bank Filiale Nurnberg v. Humphrey*, 272 U.S. 517, 47 S.Ct. 166, 71 L.Ed. 383 (1926), and their progeny. Wijsmuller's theory is that, under these cases, the Government's liability for a salvage award should be analogized to a commercial debt payable in a foreign country, namely, the Netherlands, and that the judgment day rule should apply. But a commercial case, which has its inception when two parties for mutual gain contract with each other, bears no meaningful resemblance to a salvage case, which has its inception in a maritime casualty which was the last thing the shipowner wanted.

Wijsmuller observes that the judgment day rule of the *Deutsche Bank* case was applied to a general average claim in *Sun Insurance Office Ltd. v. Arauca Fund*, 84 F.Supp. 516 (S.D.Fla.1948). But in claims for general average, arising out of a maritime contract of carriage, the method of payment of general average contributions has been agreed upon by the parties in advance of any casualty; in the cited case, the contract called for the payment of general average contributions in Germany in reichsmarks. Thus the *Deutsche Bank* rule was logically extended in *Sun Insurance*.

In its inception in a fortuitous and unforeseen casualty, the salvage case more closely resembles a maritime collision. The rule in this Circuit is that if a collision takes place within the territorial waters of a foreign country, damages are compensable at the exchange rate prevailing on the judgment day; whereas, if the collision takes place in the territorial waters of the United States or upon the high seas, the rate of exchange prevailing upon the collision date governs. See *Shaw, Savill, Albion & Co., Ltd. v. The Fredericksburg*, 189 F.2d 952

(2d Cir. 1951); *The Gylfe v. The Trujillo*, 209 F.2d 386 (2d Cir. 1954); *Conte v. Flota Mercante del Estado*, 277 F.2d 664 (2d Cir. 1960). Wijsmuller argues that this distinction in collision cases militates in favor of the judgment day rule in the case at bar, since "the salvage operation took place within the Netherlands' contiguous zone if not within Dutch territorial waters" (brief at p. 63), whatever that may mean; no proof was offered as to the recognized extent of Dutch territorial waters. Assuming, however, that the FURER's grounded position should be regarded as the equivalent of Dutch territorial waters, I am not persuaded that the collision situation is sufficiently analogous to that of salvage. In collision, we are dealing with principles of tort exclusively; application of the judgment day rate of exchange where the collision takes place in foreign territorial waters is regarded as an extension of the *lex loci delicti* concept. In salvage, the operative facts begin with a casualty; but the salvor is neither a tortfeasor nor the tortfeasor's victim, and his compensation may depend upon the terms of a contract or, in the absence of contract, by application of the general maritime law.

I conclude that, within the context of the rate of exchange problem, a salvage case is *sui generis*, and the issue cannot be determined by reference to principles derived from other areas of law.

The English courts have considered this question, and dealt with it after their own fashion. In *The Teh Hu*, [1969] 2 Lloyd's List L.Rep. 365 (C.A.), the Court of Appeal considered a salvage arbitration under the Lloyd's Standard Form of Salvage Agreement, in circumstances where the pound sterling had undergone a substantial devaluation after the salvage services were rendered, but before the date of the award. The Lloyd's salvage arbitrators, in their award, included an "uplift" of the award, in sterling, so as to make up for the devaluation. The case was taken to the Admiralty Division (Brandon, J.), which held that under the general principle of English law in cases of debt, damages were to be calculated as of the time the debt arose, and were

not affected by any change in the value of the currency between that time and the date of judgment. Accordingly the "uplift" factor added by the salvage arbitrators, to compensate for devaluation, was eliminated. The salvors carried the case to the Court of Appeal, where Justice Brandon's decision was upheld by a divided panel. Lord Denning, the Master of the Rolls, stated in his dissenting opinion that the "uplift" factor included by the salvage arbitrators should have been affirmed. In his view, the common-law rule should not be extended to English maritime law, or to arbitrations held under the Lloyd's form of salvage agreement. He observed:

"The maritime law as to salvage is a peculiarly equitable jurisdiction. It seeks to do what is fair and just both to the salvors and to the owners of the ship and cargo which is saved." [1969] 2 Lloyd's List L.Rep. at 369.

After reviewing the economic hardship visited upon the salvor because of the devaluation of the pound sterling between the time of services and the time of award, Lord Denning said:

"I do not think the maritime law should tolerate such injustice. It should make all adjustments necessary to give the salvors their just reward." *Id.* at 370.

All four judges who considered the problem presented by *The Teh Hu* suggested that the problem could be solved by amending the Lloyd's form of salvage agreement so as to provide for currency fluctuations or devaluations. Those judicial suggestions undoubtedly accounted for the amendment of the Lloyd's form to include the present Clause 17, quoted *ante*. Thus the question has been resolved in England, at least insofar as the vast majority of salvage proceedings are concerned, which are arbitrated at Lloyd's.

In the case at bar, I have held that Clause 17 is not binding contractually upon the United States. However, the clause constitutes the implementation by Lloyd's, an institution concerned for centuries with marine salvage, of suggestions put forward by

English judges in the name of simple fairness. As such, the principle embraced by Clause 17 is worthy of consideration.

■ In the absence of any authority on the point in this country, I am at liberty to choose between the views expressed by the English judges in *The Teh Hu.* I much prefer the views expressed by Lord Denning, and adopt his analysis as my own. This requires no particular innovation, since the American admiralty court has long been regarded as guided by equitable principles. In 1854, Justice Curtis on circuit said: "It is often said that a court of admiralty is a court of equity acting on maritime affairs. This is true when properly understood. A court of admiralty applies the principles of equity to the subjects within its jurisdiction." *Kellum v. Emerson*, Fed.Case No. 7,669, 2 Curt. 79 (C.C.Mass.1854), at p. 264. In a salvage case, the professional salvor, whose status as a public benefactor has been previously referred to, is particularly deserving of protection against the consequences of currency fluctuation which tends to diminish its reward.

It is not necessary to consider, in this case, all the circumstances in which currency fluctuations or rates of exchange should be considered in making an award for salvage. Arguably, the "chance salvor" is not entitled to such protection; to use Justice Willmer's phrasing in *The Queen Elizabeth, supra,* currency fluctuations may require the chance salvor to accept a smaller portion of jam. However, the professional salvor, who renders a public service and is entitled to the law's consideration in consequence, looks to its salvage awards as its daily bread. Under principles of equity and public policy, the professional salvor is entitled to protection against diminution of its reasonable award by reason of currency fluctuation.

Wijsmuller qualifies as a professional salvor. It maintains its operations and pays its bills in Dutch guilders. There is no question but that the amount of dollars it earned by its salvage services in 1974 cannot purchase as many guilders now as they would have then. I conclude that Wijsmuller's request for an "uplift" factor must be granted, and the judgment to be entered in this case will be structured accordingly.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over the subject matter and parties in this action.

2. Plaintiff rendered salvage services to the JULIUS A. FURER and her owner, the United States, during the period June 30–July 1, 1974, which had a reasonable value, at that time, of $175,000.

3. Plaintiff is entitled to judgment from the United States in an amount which will be comprised of the base amount of $175,-000, to be increased by a factor reflecting the decline in the value of the dollar in relation to the Dutch guilder, between July 1, 1974 and the date of judgment.

4. In the exercise of my discretion, I direct that each party will bear its costs of trial.

Settle judgment, in conformity with this opinion, on ten (10) days' notice.

It is So Ordered.