BLACK SEA & BALTIC GENERAL IN-
SURANCE COMPANY, LTD., Al Nisr
Insurance Company, Arabia Insurance
Company, Ltd., and The Taisho Marine
& Fire Insurance Co., Ltd., and National
Insurance and Reinsurance Co., Ameri-
can International Underwriters Mediter-
ranean, Inc., Maritime Insurance Co.,
Ltd., and Omar Ahmed al Subei, Plain-
tiffs,

v.

SS HELLENIC DESTINY et
al., Defendants.

No. 73 Civ. 4341.

United States District Court,
S. D. New York.

Oct. 28, 1980.

Hill, Rivkins, Carey, Loesberg & O'Brien,
New York City, for plaintiffs; Caspar F.
Ewig, New York City, of counsel.

Burlingham, Underwood & Lord, New
York City, for defendants; John S. Rogers,
Derick W. Betts, Jr., of counsel.

LASKER, District Judge.

Plaintiffs are underwriters of various
cargo shipments that were allegedly short-
landed, damaged on delivery, or both. The
cargo was delivered by defendants (collec-
tively the "carrier") to Saudi Arabian ports.
Plaintiffs move for partial summary judg-
ment that the Certificates of Imported
Goods (the "Certificates," Exhibits 3
through 10, Appendix to Donegan deposi-
tion) issued by Saudi Arabian Customs offi-
cials, together with the ships' Bills of Lad-
ing, establish the carrier's prima facie liabil-
ity for the missing and damaged goods not-
ed by the Certificates.[1]

---

**1.** In 1978 we granted partial summary judg-
ment to plaintiffs, finding that proper delivery

occurs at Saudi Arabia ports "only when the
goods arrive at the gates of [Customs] ware-

The rights of the parties are governed by the Harter Act, 46 U.S.C. § 190, which provides that the carrier's liability does not end until "proper delivery" of the cargo has been made.[2] A prima facie case of liability for damaged or missing cargo is made by showing that the carrier issued a clean bill of lading and that the cargo was damaged or missing upon proper delivery. Cf. *Demsey and Associates v. S/S Sea Star,* 461 F.2d 1009, 1014 (2d Cir. 1972) (decided under Carriage of Goods by Sea Act).[3]

There is no dispute here that clean bills of lading were issued for all the cargo in question. The critical issue is whether the Certificates which note damage and shortage reflect the condition of the goods at the time of "proper delivery." While the term "proper delivery" is not statutorily defined, the parties do not dispute that under the Harter Act it is to be determined according to "port customs and regulations." *David Crystal, Inc. v. Cunard Steam–Ship Company,* 223 F.Supp. 273, 282 (D.C.N.Y.), *aff'd,* 339 F.2d 295 (2d Cir. 1963), *cert. denied,* 380 U.S. 976, 85 S.Ct. 1339, 14 L.Ed.2d 271 (1965); *Tan Hi v. United States,* 94 F.Supp. 432, 433 (N.D.Cal.1950). Thus, this case turns on the interpretation to be given to Saudi Arabian Customs regulations[4] as to when, within the meaning of the Harter Act, "proper delivery" occurred at the Saudi Arabian ports.

The parties agree that Article 124 of the "Customs Regulations and Rules for Implementation" of Saudi Arabia (Exhibit 1, Appendix to Donegan deposition) sets out the relevant law. It provides that:

"Actual receipt of the goods by Customs takes place only when the goods arrive at the gates of [Customs] warehouses or at the places assigned for storage, and when a careful inspection of the external condition of the package has been made. Consequently, goods that have been unloaded remain under the control and responsibility of the shipping companies until they are actually received by the Customs warehouseman."

Thus, "proper delivery" occurs only when "a careful inspection" is made. The parties

houses or at the places assigned for storage and when a careful inspection of the external condition of the packages has been made" according to Article 124 of the "Customs Regulations and Rules for Implementation" of Saudi Arabia (Exhibit 1, appendix to Donegan deposition). We indicated that, in light of the plaintiff's uncontradicted evidence, we would be prepared to find that the Certificates presented by plaintiffs reflect the condition of the cargo at the time that liability passed from the carrier to the consignee.

Subsequent to our earlier decision, defendants have brought to our attention the fact that our reliance on the plaintiffs' evidence regarding the Certificates was possibly inconsistent with Article 131 of the Saudi Arabia customs law, which states that "while they [the goods] are in Customs, whether in the warehouse or in the yards, the goods remain there on the responsibility of the owner." If the phrase "while they are in Customs" were intended to or actually applies to a period prior to the inspection reflected in the Certificates, an event which the plaintiffs' evidence indicated was not held until clearance procedures began, then the Certificates would not reflect the condition of the cargo upon proper delivery by the defendants. Both parties have now submitted additional evidence on the relationship between Articles 124 and 131 and the procedures employed at the relevant ports.

2. 46 U.S.C. § 190 reads:

"It shall not be lawful for the manager, agent, master, or owner of any vessel transporting merchandise or property from or between ports of the United States and foreign ports to insert in any bill of lading or shipping document any clause, covenant, or agreement whereby it, he, or they shall be relieved from liability for loss or damage arising from negligence, fault, or failure in proper loading, stowage, custody, care, or proper delivery of any and all lawful merchandise or property committed to its or their charge. Any and all words or clauses of such import inserted in bills of lading or shipping receipts shall be null and void and of no effect."

3. The Carriage of Goods by Sea Act ("Cogsa") applies in foreign commerce from the time goods are loaded onto the ship to the time the goods are discharged from the ship; the Harter Act applies to the periods prior to loading and, as in this case, after discharge and before delivery. 46 U.S.C.A. § 1311. In light of the similarity between the two statutes, it is understood that Cogsa precedent is persuasive authority in Harter Act cases. See G. Gilmore and C. Black, *The Law of Admiralty,* 145–149 (2d ed. 1975).

4. The relevant regulations are appended to this opinion.

disagree as to when this inspection occurs and whether the Certificates reflect this inspection. The carrier, argues that the "careful inspection" which would constitute "proper delivery" takes place as the first act in the handling of the goods after the landing at the dock. It maintains that the Certificates which the plaintiffs have presented in this case do not reflect this inspection. The plaintiffs contend that the inspection made at the time referred to by the carrier is preliminary only and that proper delivery does not occur until a later inspection which is more thorough and which is reflected in the Certificates when issued.

Plaintiffs rely on the deposition testimony of Anthony Donegan, who became familiar with the Customs regulations and their practical application as a Lloyd's Agent in the relevant Saudi Arabian ports from 1965–1970.[5] In summary, Donegan testified that the inspection under Article 124 does not take place until the customs clearance procedures begin. Upon physical delivery only a quick examination is conducted to segregate damaged packages, not the "careful inspection" contemplated by Article 124. Furthermore, he testified that the Certificates reflect the "careful inspection" conducted in accordance with the clearance procedures.

The carrier relies on the affidavit of J. Edward Richardson, who has become familiar with the Customs regulations as a ship's agent employee and Line Representative in Saudi Arabia since 1973.[6] Richardson indicated that two inspections of the goods occur at the relevant Saudi Arabian ports. The first inspection is conducted soon after the cargo is physically delivered; at that time damaged cargo is segregated. This is the "inspection of the external condition of the packages" which ends carrier liability under Article 124, the carrier argues. A

period of time follows that inspection before the clearance procedures begin during which the owner is liable according to Article 131, which provides that "while they [the goods] are in Customs, whether in the warehouse or the yards, the goods remain there on the responsibility of the owner." At clearance, a more rigorous inspection is conducted and, according to Richardson, this later inspection is the inspection reflected in the Certificate.

The expert evidence submitted by the parties is inconclusive; not only do Donegan and Richardson disagree on the major points in issue, but they rely in large part on hearsay information in reaching their conclusions. If it were necessary to depend solely on this evidence, the issue could not be disposed of on a motion for summary judgment. However, in addition to the deposition of Donegan and the affidavit of Richardson, the record contains the Saudi Arabian Customs regulations themselves and the Certificates issued by Saudi Arabian Customs officials. Careful scrutiny of this evidence is convincing that the Certificates reflect the condition of the cargo at the time of the careful inspection referred to in Article 124, as plaintiffs contend.

We begin with the fact that, under Article 124, proper delivery by the carrier to Customs cannot occur until a "careful inspection of the external condition" of the cargo has been made. Article 131, however, contemplates a period while the goods are "in Customs" and the owner is liable. The carrier argues with some force that, under Donegan's view of the procedures, the goods would never be "in Customs" because they would be properly delivered to Customs (by virtue of the careful inspection done during clearance) at the very same time as they were being cleared out of Customs. Be that as it may, the view

---

**5.** Donegan's duties involved cargo movement and cargo losses. During his tenure as a Lloyds agent, Donegan was also a correspondence for the American Institute of Marine Underwriter. He has lectured on the insurance risks associated with shipments to Saudia Arabia.

**6.** During his early years as employee of a ship's agent, Richardson was involved with clearance and receipt of cargo on behalf of consignees in Saudia Arabia. He has also worked in the steamship and agency business in other parts of the world, and managed a Lloyds Agency for two years in Chile.

presented by the carrier is itself not compatible with the regulations as we read them; under its scenario, the "careful inspection" of Article 124 would consist merely of a segregation of damaged goods with no inventory of the *quantity* of packages.

Defendants rely on Article 127 to show that, upon physical delivery to the warehouse, some inspection is made. Article 127 requires that damaged goods be segregated, inventoried and weighed. Yet, if the requirements of the Articles immediately following Article 124 are to be looked to in order to give content to the "careful inspection" of Article 124, as the carrier suggests, it becomes clear that such inspection includes a full inventory of all cargo as well as segregation of damaged goods. Article 125 requires the warehouseman assigned to receive the goods to keep records of goods received and to compare with a shipping company representative the packages received with the packages listed on the manifest. This would appear to include an inventory of all packages physically delivered. Furthermore, Article 130 states that after receipt of the cargo, the Customs warehouseman shall give the shipping company a receipt showing the total number of packages received; in case of a shortage, the Customs Director may ask the shipping company to submit an explanation. It is only at this point that the next Article, Article 131, refers to a period of owner liability while the goods are "in Customs." Thus, reading these regulations together, the carrier's liability extends until completion of a careful inspection consisting of both a segregation and weighing of damaged goods and an inventory of all packages received.

This reading of the regulations comports with general experience. The carrier's liability does not end until a "careful inspection" has been conducted to determine not only whether any of the cargo has been delivered damaged, but also whether some of the cargo has not been delivered at all. At that point, according to Article 130, the carrier is entitled to a receipt showing what he has properly delivered, and is asked to account for any shortages. When the cargo has been so inspected, the official Customs records kept pursuant to these articles show the condition of the cargo at the point when the carrier's liability ends.

This analysis of the procedures is also supported by Article 215 of the Rules for Implementation, (renumbered Article 207 in 1970) which states that "shipping and transport companies shall be responsible for effecting actual delivery of all packages shown on the manifest... If the packages received are short, they shall be registered on the books of receipt ..." The shipping companies are then given time to locate the missing packages, a practice which would only make sense if the carrier were held responsible for not delivering the packages discovered to be missing at the time an inventory of all cargo is taken.

Moreover, Article 215 indicates that the Certificates refer to the inventory which, together with the examination to segregate damaged goods, constitutes the official receipt by Customs. "Customs shall give to those concerned, upon their request, certificates confirming the shortage ... given on the basis of official records, without any responsibility on the part of the Government in connection with the issuance of such Certificates." And most importantly, Article 215 states that "it is understood that Article 215 deals with whole packages which prove to be missing *when the shipment is received*. In this case the shipping companies shall be accountable for the missing packages." (emphasis added)

Finally, the Certificates presented by plaintiffs on their face correspond with the provisions of Article 215. Each Certificate recites official records upon which it is based, disclaims Custom's liability resulting from the issuance of the certificate, and either describes missing goods in terms of the ship having "arrived" with the cargo missing or refers to damaged goods in terms of a "weighing statement", corresponding to the requirements of Article 127. While defendants contend that the language of the Certificates does not necessarily reflect the actual facts, we find no plau-

sible reason to question these plain statements.

In sum, we find that proper delivery according to the law governing Saudi Arabian ports occurs when a "careful inspection of the external condition of the packages" is made. That inspection includes both an inventory of the total delivery and a segregation and weighing of the damaged cargo. The Certificate of Imported Goods reflects this inspection.

It is unnecessary, for the purpose of disposing of this motion, to determine when this inspection actually takes place. While a reading of the applicable regulations leaves the impression that the segregation and weighing of damaged cargo and the inventory of all the cargo occur simultaneously and soon after physical delivery, the evidence of both parties in this case indicates that the inventory, at least, is not generally conducted until clearance procedures begin. To be sure, when such delay occurs it renders Article 131 meaningless, for the goods would be cleared out of Customs just as they are officially received in Customs. Nevertheless, the determination of the factual question of when the inspection actually occurs cannot change the fact that it is this inspection which ends the carrier's liability and which is reflected in the Certificates.[7]

Plaintiff's motion for partial summary judgment on the issue of defendants' prima facie liability is granted.

It is so ordered.

## APPENDIX

### C. *Receiving and Storing Goods*

Article 124.

Actual receipt of the goods by Customs takes place only when the goods arrive at the gates of [Customs] warehouses or at the places assigned for storage, and when a careful inspection of the external condition of the packages has been made. Conse-quently, goods that have been unloaded remain under the control and responsibility of the shipping companies until they are actually received by the Customs warehouseman. In sailboats, [the responsibility] falls on the captains or the owners.

### *Entries*

Article 125.

1. The warehouseman assigned to receive the goods shall see that they are entered on an up-to-date basis in the book set up for the receipt of goods as they enter the warehouses or as they are deposited in the places assigned for them after recording the route number thereon. He shall, with a representative from the shipping company, compare the packages received with the packages listed on the manifest.

2. Packages which do not bear any marks or numbers and packages which bear marks and numbers similar to those on other packages imported on the same ship, must be given a distinguishing mark by the shipping company concerned, and such a mark must appear on all the documents on which the goods are recorded.

3. Direct delivery goods shall be recorded daily in a handbook by the Customs man at the pier. After the unloading of each shipment he shall submit a memorandum to the pier man showing all the necessary information so that it may be recorded in the proper book.

Article 126.

When items such as gold, silver, and precious stones are received they shall be deposited in special steel safes.

### *Damaged Goods*

Article 127.

1. Packages which appear to be damaged shall be kept separate from the other packages, and shall be inventoried or weighed in the presence of a representative of the shipping company who, together with the receiving warehouseman, should sign in

---

7. Defendants also presented some evidence to show that carriers never receive the receipt described in Article 130. But the carriers' failure to insist upon their right under Saudi Ara-bian law to a receipt to protect themselves in the event that goods are lost or damaged after proper delivery to Customs cannot prevent plaintiffs from recovering their due.

the column wherein such packages are recorded. The quantity or weight must be written on the packages and they shall be deposited in a separate room, called "Room for Broken Goods", in the same warehouse, and they shall be recorded in a special register that can be referred to when they are released.

2. If the shipping company or the owner of the goods requests that these packages be examined before the presentation of the Certificate [Bill of Entry] then the examination shall be made in the presence of the representative of the shipping company and the owner of the goods.

3. Shipping companies shall, in all instances, be responsible for the repair of damaged packages as Customs may regard necessary, so that such packages can be received [in Customs].

*Packages Not Shown on the Manifest*

Article 128.

Packages not shown on the manifest shall be opened and inventoried or weighed in the presence of the representative of the shipping company. A report on the results of this [opening] shall be prepared and referred to the Manifest Office so that it can add these packages to the [copy of] the manifest in its possession.

*Packages Unloaded by Mistake*

Article 129.

If packages are unloaded by mistake and the shipping company requests that they be returned to their original destination then Customs must investigate the matter by examining the documents and the original manifest relating to the packages. If Customs is satisfied then the packages shall be returned to the means of transportation under Customs supervision.

Article 130.

After receiving a ship's cargo the Customs warehouseman shall give the representative of the shipping company a receipt showing the total number of packages received. The receipt shall be approved by the piermaster or by the official acting in his place. A copy of the manifest is then returned to the Manifest Office showing in detail the total number of packages received, the packages that have not been unloaded, and the packages that are not shown on the manifest. The Customs Director may ask shipping companies to submit statements concerning discrepancies between packages actually received and packages shown on the manifest.

Owners of goods who are authorized by Customs to receive their goods directly from the pier must give the receipts to the shipping company without the intervention of Customs.

Article 131.

The Customs Administration shall assume no responsibility for any damage to the goods as a result of inevitable accidents such as fire, rainwater, etc., within the Customs Area. While they are in Customs, whether in the warehouses or in the yards, the goods remain there on the responsibility of the owners who should take whatever precautions they deem necessary to insure their goods and to withdraw them promptly from Customs.

The owners of goods may bring in tarpaulins to cover and protect their goods if they so desire.

Article 215.

The shipping and transport companies shall be responsible for effecting actual delivery of all the packages shown on the manifests of their ships upon arrival of such ships at Saudi ports.

If the packages received are short, they shall be registered on the books of receipt and on the manifests relating to them, and these must be approved by the representative of the shipping company.

Shipping companies shall be allowed a period of time not exceeding three months to bring the missing packages that were unloaded by mistake in nearby ports. A period of six months shall be allowed for bringing the missing [packages] from distant ports. If the period [allowed] elapses before the missing packages arrive, the Customs duties and charges due [thereon] shall be collected from the shipping compa-

nies on the basis of the original invoices, if these are available, or on the basis of the evaluation by Customs of the missing packages as compared to other similar ones before they are cleared from Customs.

Packages which for one reason or another have not been shipped and which the shipping companies have decided not to ship, supporting their decision by official documents and certificates satisfactory to Customs, shall have their relative manifest entries closed on the basis of such documents.

When packages are lost from the ships for unknown causes and the shipping companies declare that they have paid the value of such packages to their owners, the shipping companies shall be required to pay the Customs duties and additional charges due on these packages. However, if the captain of the ship declares that due to a casualty resulting from force majeure some of the packages have been lost, and he submits official reports to Customs confirming this fact and convincing to Customs, the manifest entries relative to such packages shall be closed on the basis of these reports.

In cases where it is decided to collect Customs duties from the shipping companies on missing packages, the following shall be complied with:

1. Captains of ships shall be fined 10% of the Customs duties on each [missing] package, provided that this fine does not exceed thirty riyals per package.

2. As regards shipments of cement, shortage not exceeding 5% shall be disregarded; but the shipping company shall be answerable for [any shortage] in excess of this percentage.

3. Sacks of grain, flour, and similar items shall be subject to the provisions of paragraph 2 above.

4. [As regards] shipments of iron, wood, pipes, elbows, and similar items, the shipping company shall not be answerable for any shortage not exceeding 5% of the weight of the shipment.

5. The captain shall submit a certificate in regard to packages which fall off the [ship's] tackle into the sea while they are being unloaded in the stream or at the piers. Such certificate shall be approved by the Coast Guard officer assigned to the ship, if the ship is in the stream, and by the Customs representative if the ship is anchored at the pier. The same applies to those packages which the ship is forced to throw overboard. These certificates shall suffice [to account] for all such [packages], and the shipping companies shall not be accountable for the shortage.

All the preceding cases mentioned in paragraphs (2) to (5) shall be handled as follows:

*First*: The manifest [entries] for the entire shipment shall be closed on the assumption that the shortage in the shipments is a probable occurrence. The manifest shall not be left open.

*Second*: The shipping companies shall not be required to pay any fine or Customs duties on any such shortage.

*Third*: The foregoing measures shall not prejudice the right of the consignee vis–a–vis the shipping or insurance companies.

*Fourth*: Customs shall give to those concerned, upon their request, certificates confirming the shortage, if they submit their request in writing. These certificates shall be given on the basis of the official records, without any responsibility on the part of the Government in connection with the issuance of such certificates.

*Fifth*: It is understood that Article 215 deals with whole packages which prove to be missing when the shipment is received. In this case the shipping companies shall be accountable for the missing packages in accordance with Article 215 of the Rules for Implementation. If they do not produce them within the specified time, or fail to account for them, then the provisions of Article 215 shall be applied, and, consequently, the captain of the ship shall be penalized for his failure to control and safeguard the goods in his custody.

*Sixth*: For bulk goods, a fine shall be imposed for any shortage exceeding 5%, in

accordance with Paragraph 3–1 above, and each one hundred kilograms of bulk goods shall be regarded as one package.

*Seventh*: The Customs director shall notify the captain's shipping company of his decision imposing the fine which shall be payable within five days from the date on which the notification of such decision is served on the ship's agent, unless those concerned appeal the Customs decision to the Commercial Court prior to the expiration of this time limit.

If a shortage is discovered in the cargo of sailboats, launches, and similar vessels, the captain of the ship (under the guaranty of the owner of the goods or his agent) must bring such shortage from the point of origin within the legal period, or else he must produce, again within the legal period, a certificate showing that, for one reason or another, the missing packages had not been loaded or that they had been delayed.

If neither the missing goods nor the certificate is produced, the captain of the ship or his guarantor shall be required to pay the duties imposed. In case Customs does not trust the captain or his guarantor, it may collect the duties on the missing goods in the form of a deposit to be kept until the documents are brought within the fixed period. If the documents are not presented, the deposit shall be credited to the Revenues Account.

If the missing goods are received within the legal period, or if the necessary certificate is obtained from the customs at the point of origin, the missing goods shall not be made subject to any restrictions. However, if it is proved later that the quantities received are not the same as those missing, or that the certificate issued by the Customs at the point of origin is not valid as a result of its being forged by the ship's master or for any other reason, then, in both instances, the shortage shall be considered subject to the Articles on smuggling.