**BLACK SEA & BALTIC GENERAL INSURANCE COMPANY, LTD., Al Nisr Insurance Company, Arabia Insurance Company, Ltd., and The Taisho Marine & Fire Insurance Co., Ltd., and National Insurance and Reinsurance Co., American International Underwriters Mediterranean, Inc., Maritime Insurance Co., Ltd., and Omar Ahmed Al Subei, Plaintiffs,**

v.

**S.S. HELLENIC DESTINY, S.S. HELLENIC GLORY, S.S. HELLENIC PIONEER, S.S. HELLENIC SPIRIT, S.S. HELLENIC SAILOR, S.S. HELLENIC LAUREL, S.S. HELLENIC HERO, S.S. HELLENIC LEADER, S.S. HELLENIC TORCH, S.S. HELLENIC STAR, their engines, boilers, tackle, etc., and Hellenic Lines, Ltd., Transpacific Carriers Corporation and Universal Cargo Carriers, Inc., Defendants.**

No. 73 Civ. 4341(MEL).

United States District Court,
S.D. New York.

Dec. 2, 1983.

As Amended Dec. 13, 1983.

---

Hill, Rivkins, Carey, Loesberg, O'Brien & Mulroy, New York City, for plaintiffs; Caspar F. Ewig, New York City, of counsel.

Burlingham Underwood & Lord, New York City, for defendants; Chris Johnson, New York City, of counsel.

---

1. *Black Sea & Baltic Ins. Co. v. SS Hellenic,* 500 F.Supp. 677 (S.D.N.Y.1980).

2. *Id.,* No. 73 Civ. 4371(MEL), slip op. (Magis.Ct. S.D.N.Y. filed Oct. 28, 1982) [hereafter Magistrate's Report].

LASKER, District Judge.

In this action, defendants ("carrier") move to alter and amend our 1980 decision granting plaintiffs partial summary judgment,[1] and have filed objections to Magistrate Kent Sinclair's Findings of Fact and Recommended Conclusions of Law on the Subject of Damages.[2] Plaintiffs ("underwriters") also move to modify and confirm Magistrate Sinclair's damage award. For the reasons set forth below, the motions of the carrier are denied and the underwriters' motion is granted in part and denied in part.

At the outset, it is necessary to consider the carrier's motion to alter and amend the 1980 judgment because granting that motion would moot Magistrate Sinclair's Report and the motions related to it.

### I.

This action was commenced on October 10, 1973 to recover $53,095 from the carrier for alleged non-delivery or misdelivery of rice, flour, auto parts, car stereos, and insulation from United States ports to ports in Saudi Arabia. The critical issue in this case is when responsibility for lost or damaged cargo passes from the carrier to the consignee.

### A.

The rights of the parties are governed by the Harter Act,[3] which requires carriers to make "proper delivery" in order to terminate their responsibility for ocean-going cargo.[4] While "proper delivery" is not defined by statute, the Act has been interpreted as requiring the carrier to deliver goods from wharf to wharf, notify the consignee of the vessel's arrival, and to protect the cargo until the consignee has a reasonable opportunity to remove it unless

3. 46 U.S.C. §§ 190–96 (1976).

4. *See Black Sea & Baltic Ins. Co. v. SS Hellenic,* 500 F.Supp. at 678; *Tan Hi v. United States,* 94 F.Supp. 432, 434–35 (N.D.Ca.1950).

these obligations are modified by local port law, custom, or regulation.[5]

In our earlier decision, we found that the port regulations of Saudi Arabia modified the Harter Act obligations to establish that "proper delivery according to the law governing Saudi Arabian ports occurs when a 'careful inspection of the external condition of the [cargo's] packages' is made."[6] This inspection was described as requiring "both an inventory of the total delivery and a segregation and weighing of the damaged cargo."[7] In order to fix the time of the transfer of responsibility and to show the extent of their loss, plaintiffs produced Certificates of Imported Goods which issue upon official receipt of cargo by Saudi Arabian Customs officials.[8]

While the earlier decision noted that it was unnecessary to determine when a "careful inspection" actually takes place for the purpose of disposing of the then pending motion, the defendants were nonetheless found prima facie liable for the cargo loss because the Customs Certificates did reflect a "careful inspection."[9] The effect of this holding was that defendants remained liable for cargo until the time when Customs officials issued their Certificates. Defendants could, however, rebut this presumption by providing evidence of a "careful inspection" at a point earlier in time than when the cargo entered customs.

Following the earlier decision, the case was referred to Magistrate Kent Sinclair to hear and report on the issues of damages.[10] After reviewing the evidence presented, Magistrate Sinclair found, among other things, that defendants "offered no proof rebutting the prima facie impact of the customs certificates."[11]

Meanwhile, the Second Circuit provided further interpretation of the Harter Act requirement of "proper delivery" in *Farrell Lines, Inc. v. Highlands Insurance Co.*[12] *Farrell* involved loss of cargo and interpretation of the Harter Act requirement of "proper delivery." The *Farrell* court was asked to decide whether the measure of cargo loss should have been based upon a count made of the goods at the time of delivery to the dock in Monrovia, Liberia, or upon a later count which showed a greater loss that was made when the cargo was delivered to the port's transit warehouse. Port regulations in Monrovia extended carrier responsibility, and therefore liability, for cargo until it arrived in a port warehouse. However, local custom provided that carriers relinquished responsibility for cargo at dockside where it was received by the Monrovia port authority agency. Faced with a conflict between port custom and regulation as grounds for modifying the requirement of "proper delivery," the *Farrell* court held that where the carrier relinquishes control of cargo, the loss should be borne by the consignee because it is in a much better position to protect against cargo loss after delivery.[13]

B.

The carrier asserts that *Farrell* requires that we alter and amend our earlier decision because custom and regulation are in conflict in Saudi ports. As a result, according to *Farrell*, "proper delivery" takes place when the carrier relinquishes control, not, as we have held, when a careful delivery takes place. The carrier relies upon

---

**5.** See *Farrell Lines, Inc. v. Highlands Ins. Co.*, 696 F.2d 28, 29 (2d Cir.1982); *Allstate Ins. Co. v. Imparca Lines*, 646 F.2d 166, 168 (5th Cir.1981); *Black Sea & Baltic Ins. Co. v. SS Hellenic*, 500 F.Supp. at 678; *Tan Hi v. United States*, 94 F.Supp. 432.

**6.** *Black Sea & Baltic Ins. Co. v. SS Hellenic*, 500 F.Supp. at 681.

**7.** *Id.*

**8.** See *id.*, 500 F.Supp. at 680.

**9.** See *id.*, 500 F.Supp. at 681.

**10.** See *id.*, No. 73 Civ. 4371(MEL) (S.D.N.Y. filed Dec. 31, 1980).

**11.** Magistrate's Report, *supra* note 2, slip op. at 23.

**12.** 696 F.2d 28 (2d Cir.1982).

**13.** *Id.*, 696 F.2d at 30.

witness testimony allegedly showing a conflict between port customs and regulations.

The underwriters argue in opposition that port regulations and custom do not conflict and they rely in large part upon the testimony of the carrier's agent in Saudi Arabia to support their claim. They quote the agent's uncontroverted testimony that his company hired and paid the salaries of the tally clerks who made a survey of the ship's cargo at the time of discharge in order to show that the carrier maintains control over cargo even after it leaves the holds of its vessels. This statement is significant because while it may show that "proper delivery" occurs at a moment after the cargo is unloaded, it also reveals that employees under defendant's control conduct a cargo count at a point in time earlier than the preparations of the Customs Certificates.

The underwriters further assert that even if port regulations do conflict with custom in Saudi Arabia, *Farrell's* holding does not require amending our earlier decision because even under *Farrell*, the carrier has not established what constitutes "proper delivery." The underwriters claim "proper delivery" places a burden upon the carrier to show what cargo was actually delivered to Customs and that in this case defendants provided no proof that the relevant ships' bills of lading were discharged in good order and condition. If such proof existed, the underwriters argue, it should have been presented to Magistrate Sinclair to rebut the earlier finding of prima facie liability based on the Customs Certificates. As noted above, however, Magistrate Sinclair found that defendants offered no such proof.

### C.

An inquiry into whether Saudi port custom conflicts with port regulation would now be appropriate were the only difference between our earlier decision and *Farrell* that we did not examine the custom in Saudi Arabia ports. However, such an examination is not needed here in light of evidence of cargo loss that the parties have presented or have had the opportunity to present.

In *Farrell*, the Second Circuit was asked to fix the measure of damages for lost cargo based upon two different counts of goods—an initial count that had been made at dockside, and a later count when the cargo was transferred to a transit warehouse. In this case, on the other hand, the Customs Certificates constitute the only evidence of cargo loss presented. Accordingly, no basis exists for revising our earlier finding of when "proper delivery" takes place in this instance because the carrier has had an opportunity to produce evidence under its control showing what its liability would be were we to find that "proper delivery" occurs when the carrier relinquishes control over the cargo. Because the carrier has been unable to produce such evidence, the Customs Certificates continue to establish its prima facie liability.

As discussed above, the earlier decision in this case held that a "careful inspection" established "proper delivery" in Saudi Arabia and that the defendants were prima facie liable because the Customs Certificates were evidence of such an inspection. We then referred this matter to Magistrate Sinclair on the question of damages where defendants were presented with the opportunity to rebut the effect of the Certificates by producing evidence of a "careful inspection" at a moment earlier than the receipt of cargo by Customs. This earlier inspection would have conceivably shown a smaller cargo loss than the one reflected in the Customs Certificates.

One source of evidence which should have been readily available to the carrier to rebut the effect of the Certificates were the tally sheets prepared by the employees of the carrier's agent at the moment of discharge of cargo. But the carrier did not produce this evidence under its control, and Magistrate Sinclair found that defendants had not rebutted the Customs Certificates prima facie effect.

These same tally sheets would have to be produced by the carrier to show the cargo loss at the moment when it asserts it relinquished control.[14] However, because we find Magistrate Sinclair's findings to be correct, we further find that the carrier cannot rely upon tally sheets to establish its liability under the *Farrell* standard when it was unable to provide this same evidence to Magistrate Sinclair. Accordingly, the Customs Certificates continue to reflect the carrier's prima facie liability.

## II.

Both the underwriters and the carrier have raised objections to the portions of Magistrate Sinclair's Report concerned with the admissibility of evidence showing the extent of cargo loss. The objections are overruled.

### A.

Magistrate Sinclair was offered evidence of lost cargo in the form of commercial invoices, claim settlement documents, and subrogation receipts.[15] He found that the rules of hearsay prevented admission of most of these records, but concluded that some commercial invoices could be admitted where they met the demands of the business records hearsay exception.[16] The Magistrate recognized that while the exception is concerned with the records of a business offered by or on behalf of that business, the commercial invoices presented here were not generated by the companies of the authenticating witnesses but were only received by them.[17] He further noted that a narrow expansion of the business records rule permits receipt into evidence of records received and maintained by an entity in the ordinary course of business.[18] Magistrate Sinclair reviewed the deposition testimony of the witnesses pertaining to this issue and admitted invoices "[o]nly where the witnesses could say with some assurance that the [invoices] were received at or about the time in question, were kept in the files and were relied upon in the regular course of business...." [19]

The Magistrate also reviewed the admissibility of the Customs Certificates offered to show the extent of damaged or lost cargo. He pointed out that these documents were covered by the authentication procedures of the Federal Rules of Evidence or Procedure [20] and that while "final certification" of the documents had not been obtained, there were sufficient reasons, which are discussed below, to consider them presumptively authentic and hence admissible under the rule.[21]

### B.

The underwriters contest Magistrate Sinclair's refusal to admit into evidence a number of commercial invoices. They claim that since the excluded invoices were internally consistent with other invoices that were admitted and since the underwriters relied upon all the invoices in preparing their adjustment for the consignees, the Magistrate should have accepted all of the invoices into evidence.

The carrier contests Magistrate Sinclair's decision to admit any commercial invoices

---

**14.** The carrier's witnesses testified that the carrier relinquishes control of the cargo at the time of discharge because the stevedores used to unload the ship are under the direction and control of the port authority agency. *See, e.g.,* Affidavit of J. Edward Richardson, Line Representative of Central Gulf Lines, Inc., Mar. 15, 1978, attached to Affidavit of John S. Rogers, Attorney for Defendant, filed Mar. 21, 1979, at Exhibit AA.

**15.** *See* Magistrate's Report, *supra* note 2, slip op. at 16.

**16.** *See* Fed.R.Evid. 803(6); Magistrate's Report, *supra* note 2, slip op. at 16.

**17.** *See* Magistrate's Report, *supra* note 2, slip op. at 16.

**18.** *See* Magistrate's Report, *supra* note 2, slip op. at 17 & n. 5.

**19.** Magistrate's Report, *supra* note 2, slip op. at 18.

**20.** *See* Magistrate's Report, *supra* note 2, slip op. at 12; Fed.R.Civ.P. 44; Fed.R.Evid. 902(3).

**21.** *See* Fed.R.Evid. 902(3); Magistrate's Report, *supra* note 2, slip op. at 12–13.

or other claims documents arguing that they do not fall within the business records hearsay exception. In the carrier's view, the exception does not apply where the witnesses' business did not prepare the documents and, in any case, there was no testimony that the documents had been received in the regular course of business. The carrier further objects to Magistrate Sinclair's decision to admit the Customs Certificates. It challenges the Magistrate's ruling that such documents are presumptively authentic.

## C.

The Magistrate's decision to admit documentary evidence was based upon his application of the hearsay rules. Since this raises questions of law or mixed questions of law and fact, plenary review of his ruling is appropriate.

### 1. Commercial Invoices

■ Magistrate Sinclair correctly applied the business records hearsay exception when he admitted the invoices. The business records exception permits the admission of the business record as evidence of the truth of the matters stated if it was made at or about the time of the event by a person with knowledge, and was made and kept in the course of a regularly conducted business activity.[22] While the exception may have been at one time applicable only to documents actually prepared by witnesses who testified as to their authenticity, the Second Circuit has noted that the exception " 'favor[s] the admission of evidence rather than its exclusion if it has any probative value at all' ",[23] and that "[o]ther circuits have recognized that under Rule 803(6)

business records are admissible if witnesses testify that the records are integrated into a company's records and relied upon in its day to day operations".[24] In addition, other courts have held that documents can be generally admitted into evidence if deemed sufficiently trustworthy.[25]

Magistrate Sinclair admitted into evidence invoices as to which witnesses did testify that the invoices were actually received during the ordinary course of the witnesses' business. In such circumstances, the demands of the business records exception for the admission of trustworthy evidence have been met. It follows that the carrier is incorrect in asserting that Magistrate Sinclair's decision to admit such invoices had no basis in law and was not supported by testimony. In sum, the objections to the Magistrate's ruling pertaining as to the admission of commercial invoices and various claims document are rejected.

### 2. Customs Certificates

■ Magistrate Sinclair was correct in finding that the Customs Certificates were admissible because they were presumptively authentic. He based his decision upon the fact that (1) while the carrier had known of the Certificates' existence for years, not one iota of evidence had been introduced casting doubt upon their authenticity; (2) the carrier had declined to participate in a side-trip during the taking of depositions in Saudi Arabia that might have cleared up questions of authenticity; and (3) testimony from one witness was sufficient to establish an independent authentication of the evidence presented and was sufficient for finding the Certificates authentic.[26]

22. *See United States v. Lieberman,* 637 F.2d 95, 100 (2d Cir.1980).

23. *In re Ollag Constr. Equip. Corp.,* 665 F.2d 43, 46 (2d Cir.1981), *quoting United States v. Carranco,* 551 F.2d 1197, 1200 (10th Cir.1977).

24. *In re Ollag Constr. Equip. Corp.,* 665 F.2d at 46, *citing United States v. Ullrich,* 580 F.2d 765, 771–72 (5th Cir.1978); *United States v. Carranco,* 551 F.2d at 1200; *Braunstein v. Massachusetts Bank & Trust Co.,* 443 F.2d 1281, 1284 (1st Cir.1971).

25. *See, e.g., In re King Enterprises, Inc.,* 678 F.2d 73, 78 (8th Cir.1982).

26. *See* Magistrate's Report, *supra* note 2, slip op. at 13. The carrier disputes Magistrate Sinclair's findings by arguing that (1) doubts about the Certificates' authenticity arise from the underwriters' failure to identify them through the companies that allegedly received them; (2) little was to be gained from side trips to gather further deposition testimony; and (3) the deposition testimony of the witness cited by Magis-

Rule 902 of the Federal Rules of Evidence provides that extrinsic evidence of authenticity is not required as a condition precedent to admit foreign public documents into evidence. While a final certification by relevant United States or foreign diplomatic officials is generally required, the Rule permits the court, when good cause is shown, to treat certain foreign documents as presumptively authentic "[i]f reasonable opportunity has been given to all parties to investigate [their] authenticity and accuracy".[27]

The Customs Certificates in issue here are prepared by Saudi Customs officials and could therefore be eligible to be classified as foreign public documents. The question remains whether Magistrate Sinclair's decision to treat the Certificates as presumptively authentic given the absence of a "final" certification,[28] was justified under the circumstances. We find that in light of the lengthy period of time between the commencement of this litigation and the issuance of Magistrate Sinclair's report (nine years), the failure of the carrier to produce any evidence casting doubt upon the validity of the Customs Certificates, and the independent deposition testimony of Sheikh Zahid supporting the Certificates' authenticity, Magistrate Sinclair was correct to admit them as presumptively authentic.[29] The carrier's objection to the Customs Certificates is therefore overruled.

### III.

The carrier also raises objections which challenge the Magistrate's assessment of any damages at all against it. It argues that Magistrate Sinclair should not have assessed damages "based upon the accepted evidence"[30] which it claims included subrogation receipts and claim settlement documents other than those discussed above. The carrier asserts that use of such evidence is impermissible because a carrier cannot be held liable for a consignee's supposed losses solely on the basis of evidence that a claim relating to such a loss was paid by the underwriters.

■ The carrier is incorrect when it argues that the Magistrate based his decision to admit into evidence certain documents solely on the fact that the materials were used by the underwriters to make cargo damage or loss adjustments. While Magistrate Sinclair did admit some claim settlement calculations and subrogation receipts, he received into evidence only those

"documents for which rigorous standards of authentication have been met. Where the deposition witness has been able to testify that he definitely recognizes the signature on the document or recognizes the form of the document as that regularly used in the course of his business, such documents will be accepted as business records pursuant to F.R.Ev. 803[6]."[31]

The Magistrate did note that the precise documents submitted were not found in the

---

trate Sinclair was insufficient to cure the Certificates' hearsay problems. *See* Defendants' Objections to Magistrate's Report, filed Nov. 15, 1982, at 1–2.

**27.** Fed.R.Evid. 902(3).

**28.** The Federal Rules of Evidence describe a foreign public document in part as:

"A document purporting to be executed or attested in his official capacity by a person authorized by the laws of a foreign country to make the execution or attestation, and accompanied by a final certification as to the genuineness of the signature and official position (A) of the executing or attesting person, .... If reasonable opportunity has been given to all parties to investigate the authenticity and

accuracy of official documents, the court may, for good cause shown, order that they be treated as presumptively authentic without final certification ...."
Fed.R.Evid. 902(3).

**29.** *See In re Sterling Navigation Co.*, 444 F.Supp. 1043, 1047–48 (S.D.N.Y.1977) (failure of party to dispute the authenticity of foreign public document over a six month period cited as one reason for holding the document presumptively authentic under Fed.R.Evid. 902(3)).

**30.** Magistrate's Report, *supra* note 2, slip op. at 24.

**31.** Magistrate's Report, *supra* note 2, slip op. at 20.

files of the witnesses who testified about them, but concluded that there was no reason to doubt their accuracy given the length of time the case has been pending (at that time nine years) without a reason to doubt their accuracy surfacing, and given all the circumstances of the case.[32] Because an adequate foundation for trustworthiness was established to admit these documents into evidence, the carrier's argument is determined to be without merit. The objection is therefore overruled.

The carrier further objects to Magistrate Sinclair's Report on the ground that the consignee's failure to testify about damages during the taking of depositions in Saudi Arabia should result in a negative inference against the underwriters so that the damage claims assessed against it should be dismissed. It is unclear from a review of the record whether the negative inference issue was raised before Magistrate Sinclair.[33] In any event, it is unnecessary to decide who is responsible for the consignees' failure to testify in light of the evidence which was adequate to establish the carrier's liability. The carrier's objection is accordingly overruled.

### IV.

The final issue to be considered are the underwriters' motions to modify Magistrate Sinclair's damage award (1) to apply the Saudi Arabia riyal-United States dollar exchange rate as of the date of judgment instead of as of the date of loss, and (2) to award the underwriters pre-judgment interest. These motions are granted.

### A.

Magistrate Sinclair based his assessment of damages upon dollar or riyal amounts, depending upon the kind of proof that was found to be admissible. Where riyal fig-

ures were presented by the parties, the Magistrate ordered that the dollar-riyal exchange rate apply as of the date of loss.[34]

The underwriters argue that since an American Court can only give judgment in dollars, the rate of exchange applied in order to make them whole, should be the rate on the date of judgment. The carrier has offered no arguments in opposition.

The Second Circuit has held in *Shaw, Savill, Albion & Co. v. The Fredericksburg*[35] that the appropriate rate of exchange, in circumstances such as obtain here, should be set as of the date of judgment. At issue in that case was the proper exchange rate to apply to a settlement of damages arising from the collision of two steamships in British territorial waters. Judge Frank stated that:

"It is well settled that a money judgment by an American court must be in American currency. The question therefore arises, in a case like this, as to the proper date for the conversion of the foreign currency into our own. The controlling authorities in the federal courts are *Hicks v. Guinness*, 269 U.S. 71, 46 S.Ct. 46, 70 L.Ed. 168 [1925], and *Die Deutsche Bank Fialiale Nurnberg v. Humphrey*, 272 U.S. 517, 47 S.Ct. 166, 71 L.Ed. 383 [1926]. They have been summarized by Williston as follows. The Supreme Court 'has held that the exchange value of damages for breach of an obligation performable in foreign currency in the United States is taken at the time of the breach, * * * ; but *where the obligation is performable in a foreign country in the money of that country, the judgment day rule has been held applicable, on the ground that "an obligation in terms of the currency of that country takes the risk of the currency*

---

**32.** *See* Magistrate's Report, *supra* note 2, slip op. at 19–20.

**33.** The carrier's counsel did discuss the non-appearance of the consignees during a hearing before Magistrate Sinclair on June 7, 1982. However, counsel's remarks were limited to a discussion of the inadequate foundation supporting the admission of various documents of-

fered by the underwriters into evidence. *See* Hearing Transcript, June 7, 1983, at 7–10.

**34.** *See* Magistrate's Report, *supra* note 2, slip op. at 24–25.

**35.** 189 F.2d 952 (2d Cir.1951).

*fluctuation* \* \* \*  If the debt had been due here and the value of dollars had dropped before suit was brought, the plaintiff could recover no more dollars on that account." ' " [36] (emphasis added)

▆ The underwriters have cited no cases involving loss of cargo. Nonetheless, the "judgment day" rule applies because this case is based upon the non-delivery or mis-delivery of cargo to ports in Saudi Arabia. Since the obligation is performable in Saudi Arabia [37] in Saudi riyals, the judgment day rule articulated in *Shaw, Savill, Albion & Co.* establishes the appropriate exchange rate. The carrier bears the risk of currency fluctuation where, as here, it was obligated to pay the consignees and later the underwriters for the lost cargo at the time that the shortfall was discovered. The underwriters' motion to modify the dollar-riyal exchange rate to apply as of the date of judgment is therefore granted.

### B.

▆ Magistrate Sinclair made no provision for an award of prejudgment interest. The underwriters argue in favor of such an award on the grounds that it is necessary to make them whole. The carrier does not argue against a prejudgment interest award but cites many cases for the proposition that since the underwriters

have offered no proof of interest rates, an award of 6% is appropriate in this instance.

In admiralty cases, prejudgment interest is awarded as a general rule and is denied only where exceptional circumstances are present. [38] In this case, no exceptional circumstances bar an award of prejudgment interest.

Although as Judge Oakes has recognized, trial courts abuse their discretion when they fail to award prejudgment interest in admiralty cases when exceptional circumstances do not exist, they possess broader discretion to determine the date from which interest should be payable and the rate of interest which should apply. [39] There is an "overwhelming" amount of case law which supports the holding that in both land and sea carriage, prejudgment interest is ordinarily awarded from the time when the destroyed or lost goods should have been delivered by the carrier. [40] Given the weight of precedent, the prejudgment interest rate in this case should apply as of the dates when the carrier should have made its deliveries to the consignees.

The underwriters argue that the appropriate judgment interest rate to apply in this instance is the one associated with federal paper as found in the Federal Reserve Bulletin covering the time period in

**36.** *Id.,* 189 F.2d at 954–55 (footnotes omitted), *quoting,* 5 Williston on Contracts (Rev. ed.) 3929–3930, *quoting, Die Deutsche Bank Filiale Nurnberg v. Humphrey,* 272 U.S. at 519, 47 S.Ct. at 167.

On the other hand, the Second Circuit has held that where a maritime collision occurs in United States territorial waters or on the high seas, as opposed to in foreign waters, the exchange rate applies as of the date of the collision. *See Conte v. Flota Mercante Del Estado,* 277 F.2d 664, 670–71 (2d Cir.1960); *The Gylfe v. The Trujillo,* 209 F.2d 386 (2d Cir.1954); *B.V. Bureau Wijsmuller v. United States,* 487 F.Supp. 156, 177 (S.D.N.Y.1979), *aff'd mem.,* 633 F.2d 202 (2d Cir.1980). Moreover, a federal court sitting in diversity applies the rule of the local forum which, in New York for instance, is the exchange rate as of the date of the breach. *See Vishipco Line v. Chase Manhattan Bank,* 660

F.2d 854, 865 (2d Cir.1981), *cert. denied,* —— U.S. ——, 103 S.Ct. 313, 74 L.Ed.2d 291 (1982).

**37.** This conclusion is based on the proposition that delivery was to have been made in Saudi Arabia and that neither party has suggested that the carrier's obligations were to be performed elsewhere.

**38.** *See Indep. Bulk Transp. v. Vessel "Morania Abaco",* 676 F.2d 23, 25 (2d Cir.1982); *Mitsui & Co. v. Am. Export Lines,* 636 F.2d 807, 823 (2d Cir.1981); *Van Nievelt, Goudriaan Co's Stoomvart Maatschappij, N.V. v. Cargo & Tankship Corp.,* 421 F.2d 1183, 1185 (2d Cir.1970).

**39.** *See Indep. Bulk Transp. v. Vessel "Morania Abaco",* 676 F.2d at 25.

**40.** *See Mitsui & Co. v. Am. Export Lines,* 636 F.2d at 824 and cases cited therein.

question. The carrier claims, as discussed above, that because the underwriters have offered no proof at trial on the applicable interest rate, a 6% rate of interest should apply here. We agree that the prejudgment interest rate advocated by the underwriters should apply in this case given the Court of Appeals' ruling that "[p]laintiff is entitled to the income which the monetary damages would have earned, and that should be measured by interest on short-term, risk-free obligations."[41]

Defendants' motions are denied. Plaintiffs' motion is granted in part and denied in part. The Magistrate's Report is confirmed except that the dollar-riyal exchange rate shall be calculated as of this date and that prejudgment interest shall be payable as specified above.

Submit judgment on notice.

---

**41.** *Indep. Bulk Transp. v. Vessel "Morania Aba-co",* 676 F.2d at 27, *quoted in, Red Star Barge Line, Inc. v. Nassau County Bridge Auth.,* 683 F.2d 42, 45 (2d Cir.1982).