972 F.2d 498
 1994 A.M.C. 1441, 36 Fed. R. Evid. Serv. 396
 RAPHAELY INTERNATIONAL, INC.; Via Assurance Nord Monde;
L'Europe; Navigation & Transport; G.F.A.; Chasyr; Nieuw
Rotterdam; Q.B.E.; Parisienne de Garantie; Black Sea and
Baltic; Boreas; Allianz; Alpina; L'Alsacienne; Ancienne
Mutuelle; Ass. Generales Phenix; Astree; C.A.M.A.T.; Le
Continent; Languedoc; Rhin & Moselle; Lloyd Continental;
Nantaise; Assurances Nationales; New Hampshire; Reunion
Europeenne; Reunione Adriatica; Skandia; Assurances
Generales; Nouvelle D'Assurance; and Independence,
Plaintiffs-Appellees,
v.
WATERMAN STEAMSHIP CORPORATION, in personam, and the Vessels
Stonewall Jackson; Benjamin Harrison, and Robert
E. Lee, and their engines, boilers,
etc., in rem, Defendants-Appellants,
Societe Generale de Surveillance, S.A., Defendant.
 No. 1839, Docket 92-7393.
 United States Court of Appeals,
Second Circuit.
 Argued July 15, 1992.
Decided Aug. 14, 1992.
 
 Joseph C. Smith, New York City (Burlingham Underwood & Lord, of counsel), for defendants-appellants.
 Louis G. Juliano, New York City (Frederick A. Lovejoy, Bigham Englar Jones & Houston, of counsel), for plaintiffs-appellees.
 Before: ALTIMARI and WALKER, Circuit Judges, and SPRIZZO, District Judge.*
 ALTIMARI, Circuit Judge:
 
 
 1
 Defendants-appellants Waterman Steamship Corporation, S/S STONEWALL JACKSON, S/S BENJAMIN HARRISON, and S/S ROBERT E. LEE (collectively "Waterman") appeal from a judgment of the United States District Court for the Southern District of New York (Owen, J.), entered after a fourteen day non-jury trial, holding them liable for cargo losses sustained by Raphaely International, Inc. ("Raphaely"). The district court found that Waterman had received Raphaely's cargo of peanuts in good order, but failed to deliver it in an acceptable condition.
 
 
 2
 On appeal, Waterman argues that the district court erred in admitting into evidence certificates pertaining to the condition of Raphaely's peanuts issued by Gezira Trade & Services, Ltd. ("Gezira"), a company owned by the Sudanese government charged with inspecting exports. Gezira issued these certificates in its capacity as the agent of Societe Generale de Surveillance, S.A. ("SGS"), a Swiss company which controls a network of local inspection, testing, and certification services in a number of different countries. Raphaely claimed that it hired SGS to oversee the testing of its peanuts. However, according to Waterman, Gezira's certificates were inadmissible both because they had not been authenticated as required by Rule 902(3) of the Federal Rules of Evidence and because they were hearsay.
 
 
 3
 Waterman also maintains that a number of the district court's findings of fact, concerning, for example, the seaworthiness of its vessels and the moisture content of the peanuts, were clearly erroneous. Finally, Waterman contends that the district court erred in finding that aflatoxin, a carcinogenic substance produced during the growth of the mold Aspergillus Flavus, which is often found in peanuts, is not an "inherent vice" in peanuts as defined by the Carriage of Goods by Sea Act ("COGSA"). See 46 U.S.C.App. § 1304(2)(m).
 
 
 4
 For the reasons set forth below, we affirm.
 
 BACKGROUND
 
 5
 In 1980 a severe drought in the Southeastern United States caused a shortage of peanuts. Seizing upon the economic opportunity that this shortage created, Raphaely, a commodity trader, purchased several thousand tons of Sudanese peanuts for resale in the United States. Under its purchase contract, Raphaely was responsible for arranging the transportation of the peanuts from Sudan to the United States.
 
 
 6
 Raphaely entered into a contract with Waterman to ship the peanuts aboard Waterman's Lighter Aboard Ship ("LASH") vessels from Port Sudan to Norfolk, Virginia. LASH vessels are equipped with a built-in crane capable of lifting LASH barges out of the water and loading them into the hold or onto the deck of the "mother ship." The system permits the mother ship to stop at a port and pick up barges that have been previously loaded. Raphaely believed that the use of LASH barges and vessels would shorten the time required for delivery of its peanuts.
 
 
 7
 Before being loaded onto the LASH vessels, the peanuts were inspected, as required by Sudanese law, by the Sudanese National Analytical & Quality Control Laboratories ("Sudanese National Laboratory") and found to be "aflatoxin nil." These findings were incorporated by Gezira, the agent of SGS, into certificates of inspection which had attached to them copies of the Sudanese National Laboratory's findings. Gezira also issued order bills of lading for each barge stating that the goods were "received in apparent good order and condition."
 
 
 8
 When the peanuts arrived in the United States they were inspected by the United States Department of Agriculture. The Department of Agriculture rejected all of the peanuts either because of aflatoxin contamination or beetle infestation. At a later inspection, all of the barges were found to have excessive levels of aflatoxin.
 
 
 9
 Raphaely filed suit on September 21, 1982, claiming that Waterman was liable for Raphaely's damages under COGSA. Raphaely's complaint also charged SGS with negligently sampling, surveying, and testing the quality and condition of the cargo.
 
 
 10
 Evidence at trial indicated that after the barges were loaded at Port Sudan, they were towed offshore to a fleeting area to await the arrival of the mother vessel. These barges sat in the fleeting area for several days. The district court found that the barges were subject to temperatures that were well within the range necessary to produce aflatoxin. Indeed, according to one witness, the decks of the barges were "too hot to walk on." The hulls, on the other hand, sat in cool ocean water. Expert testimony at trial indicated that the temperature gradients that resulted allowed for "moisture migration." The district court found that combined with the entry of water into the barges through leaking hatch covers and hulls, moisture migration resulted in moisture levels that permitted the production of aflatoxin.
 
 
 11
 The LASH barges were off-loaded at Norfolk, Virginia in May, 1981, but testimony at trial indicated that the peanuts remained in the harbor between five and eighteen days before being unloaded. Evidence at trial also revealed that several of the barges contained standing water, and stained or wetted bags showing mold or mildew.
 
 
 12
 After a fourteen day non-jury trial, the district court (Owen, J.) held that Waterman was responsible for the damage suffered by Raphaely. Liability was imposed under § 1303(1) of COGSA, for failing to exercise "due diligence" in: (1) making the ship seaworthy; (2) properly "equip[ping] and supply[ing] the ship"; and (3) making the holds "fit and safe for the reception, carriage, and preservation" of the goods. Waterman was also held liable under § 1303(2) of COGSA for failing "properly and carefully" to "load, handle, stow, carry, keep, care for, and discharge the goods carried." The district court dismissed Raphaely's claim against SGS, finding that Gezira, not SGS, issued the inspection certificates, and that no contract existed between Raphaely and SGS. In dismissing this claim, the court also noted that Gezira's inspection of the peanuts was proper.
 
 
 13
 Waterman now appeals.
 
 DISCUSSION
 I. Authenticity of Foreign Documents
 
 14
 On appeal, Waterman first contends that the district court erred in admitting into evidence the certificates of inspection issued by Gezira. According to Waterman, these certificates were not properly authenticated pursuant to Fed.R.Evid. 902(3). Waterman further argues that these certificates were hearsay evidence that should have been excluded. These contentions are without merit.
 
 
 15
 To establish its prima facie case under COGSA Raphaely needed to prove: "(1) delivery of the goods to the carrier in good condition and (2) outturn by the carrier in damaged condition." Westway Coffee Corp. v. M.V. Netuno, 675 F.2d 30, 32 (2d Cir.1982). In order to prove that the peanuts were damaged while in Waterman's custody, Raphaely introduced into evidence certificates of inspection issued by SGS's agent, Gezira. These certificates incorporated the findings of the Sudanese National Laboratory and attested to the good order and condition of the peanut cargoes prior to loading. Waterman claims that the district court erred in finding these certificates to be authentic. We review the district court's finding of authenticity under the abuse of discretion standard. See, e.g., United States v. Chu Kong Yin, 935 F.2d 990, 994 (9th Cir.1991).
 
 
 16
 Rule 902(3) of the Federal Rules of Evidence provides that extrinsic evidence of authenticity is not required as a condition precedent to admitting foreign public documents into evidence. Initially, we observe that the certificates at issue are "foreign public documents." Gezira, having been nationalized by the Sudanese government, is a governmental entity engaging in inspection work that is required by Sudanese law, and the certificates issued by it are accordingly foreign public documents for purposes of Fed.R.Evid. 902(3). See United States v. Regner, 677 F.2d 754, 758 n. 3 (9th Cir.), cert. denied, 459 U.S. 911, 103 S.Ct. 220, 74 L.Ed.2d 175 (1982) (affirming the district court's holding that records of the state-owned Hungarian taxicab company were foreign public documents). Rule 902(3) provides that a properly executed or attested foreign public document must be accompanied by a final certification of genuineness from an authorized government official. Where a foreign public document is not certified, Rule 902(3) provides that the document may be "treated as presumptively authentic" if two conditions are satisfied: (1) the parties have been "given reasonable opportunity ... to investigate the authenticity and accuracy" of the document; and (2) there is a showing of "good cause".
 
 
 17
 In the case at bar, there was no final certification of the documents at issue. Therefore, the two conditions for treatment of a non-certified foreign public document must be satisfied.
 
 
 18
 Waterman had nine years preceding trial to challenge the authenticity of these certificates. This time period provided Waterman with a reasonable opportunity to investigate the authenticity and accuracy of the certificates, satisfying the first condition for excuse of the certification requirement. The second prerequisite to excuse of the certification requirement was satisfied by Waterman's delay in challenging the documents and its failure to adduce at trial any evidence casting doubt upon the certificates' authenticity. This provided the district court with a basis for finding "good cause" to treat the certificates as presumptively authentic. See, e.g., United States v. De. Jongh, 937 F.2d 1, 5 (1st Cir.1991) ("Where the adversary, despite a fair chance to examine into the document's bona fides, casts no serious doubt on its authenticity, a finding of good cause can much more readily eventuate."); Black Sea & Baltic Gen. Ins. Co. v. S.S. Hellenic Destiny, 575 F.Supp. 685, 692 (S.D.N.Y.1983) (finding good cause where litigation had been proceeding for nine years and no evidence was produced casting doubt upon validity of proffered public documents). Therefore, the court did not abuse its discretion in finding that these certificates were authentic. See Black Sea, 575 F.Supp. at 692.
 
 II. Admissibility of Certification
 
 19
 Waterman also claims that these certificates were inadmissible hearsay. However, these certificates were business records made and kept in the course of a regularly conducted business activity. As such they fall under the business records exception to the hearsay rule, and can be admitted into evidence with the proper foundation. Fed.R.Evid. 803(6); see also Saks Int., Inc. v. M/V Export Champion, 817 F.2d 1011, 1013-14 (2d Cir.1987).
 
 
 20
 In order to provide the proper foundation for the admission of Gezira's certificates into evidence, Colin Kay, a chemist in charge of quality control at SGS's El Sheikh laboratory where the peanuts were inspected, testified that he was entirely familiar both with Gezira's operations and the signatories of the inspection certificates. Kay further testified that the Gezira certificates were made in the regular course of Gezira's business activity as agent for SGS. Finally, Kay described how the peanuts were processed, sampled, inspected, and tested, thereby indicating that the records had sufficient indicia of trustworthiness to be considered reliable, which is the most important precondition to admission under Fed.R.Evid. 803(6). Id. at 1013.
 
 
 21
 Waterman nevertheless argues that Kay's testimony did not lay the proper foundation. We reject this contention. In providing the foundation for admission of these certificates under Rule 803(6) it is irrelevant that Gezira was not a party to this lawsuit. See Id. Likewise, it is irrelevant that the foundation for this evidence was laid by an employee of SGS rather than an employee of Gezira's. Id. at 1013-14. Therefore, Kay's testimony laid the proper foundation for the admissibility of the certificates into evidence, and we find that the district court did not abuse its discretion in allowing them into evidence pursuant to Rules 902(3) and 803(6).
 
 III. The District Court's Findings of Fact
 
 22
 Waterman next challenges a number of the district court's findings of fact concerning, for example, the seaworthiness of Waterman's vessels and the moisture content of the peanuts. These challenges are unpersuasive.
 
 
 23
 A district court's factual determinations will not be disturbed unless "clearly erroneous." See Fed.R.Civ.P. 52(a); McNeil-P.C.C., Inc. v. Bristol-Myers Squibb Co., 938 F.2d 1544, 1550 (2d Cir.1991). "A finding is 'clearly erroneous' when, considering the entire record, the reviewing court is 'left with a definite and firm conviction that a mistake has been committed.' " McNeil-P.C.C., Inc., 938 F.2d at 1550 (quoting Anderson v. City of Bessemer City, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (citation omitted)). "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." Anderson, 470 U.S. at 573-74, 105 S.Ct. at 1511.
 
 
 24
 The district court conducted a fourteen day bench trial, which resulted in a trial transcript of more than 1300 pages and the admission of hundreds of exhibits into evidence. Viewed in its entirety, the record on appeal contains ample evidence to support the district court's findings of fact. For example, the court heard testimony from a marine surveyor that almost all of the peanut cargoes carried in LASH barges from many different locations and shippers had been rejected for excessive levels of aflatoxin. This surveyor also testified that several of the barges in question contained either water, or stained and wetted bags. The court therefore had ample reason to conclude that these barges were unseaworthy because they were not "reasonably fit to carry the cargo which [Waterman had] undertaken to transport." The Silvia, 171 U.S. 462, 464, 19 S.Ct. 7, 8, 43 L.Ed. 241 (1898). The court also heard testimony concerning the conditions to which these barges were subjected, indicating that because of "moisture migration," the peanuts were ripe for the production of aflatoxin. After hearing the conflicting testimony and carefully reviewing the record, the district court reasonably concluded that the damage to Raphaely's peanuts occurred while they were in Waterman's care.
 
 IV. The Finding of No Inherent Vice
 
 25
 Finally, Waterman claims that even if the peanuts were damaged during shipment, liability under COGSA was improperly imposed, because the district court erred in finding that peanuts do not suffer from an "inherent vice." This contention is without merit.
 
 
 26
 Once Raphaely had proven its prima facie case, the burden shifted to Waterman to show that the loss or damage fell within one of the COGSA exceptions set forth in 46 U.S.C.App. § 1304(2). See Vana Trading Co. v. S.S. Mette Skou, 556 F.2d 100, 105 (2d Cir.), cert. denied, 434 U.S. 892, 98 S.Ct. 267, 54 L.Ed.2d 177 (1977). Under § 1304(2) neither the carrier nor the ship is responsible for loss or damage arising from an inherent vice of the goods.
 
 
 27
 An "inherent vice" is defined as "any existing defects, diseases, decay or the inherent nature of the commodity which will cause it to deteriorate with a lapse of time." Vana Trading Co., 556 F.2d at 104 (citation omitted). Whether a particular commodity suffers from an inherent vice is a mixed question of law and fact and as such is open to full review. See, e.g., Puma Indust. Consulting, Inc. v. Daal Assocs., Inc., 808 F.2d 982, 986 (2d Cir.1987).
 
 
 28
 The district court heard evidence that peanuts were susceptible to disease, but no evidence was introduced that peanuts are a commodity which will deteriorate with a lapse of time. As the district court correctly noted, the fact that a cargo may be susceptible to disease does not amount to an inherent vice. See Vana Trading Co., 556 F.2d at 104. We therefore find that peanuts do not suffer from an inherent vice.
 
 CONCLUSION
 
 29
 We have examined each of appellants' remaining arguments and find them to be without merit. In light of the foregoing, the district court's judgment is affirmed.
 
 
 
 *
 Hon. John E. Sprizzo, United States District Court for the Southern District of New York, sitting by designation